953 P.2d 1315

**KOREAN BUDDHIST DAE WON
SA TEMPLE OF HAWAII,**
Appellant–Appellant,

v.

**Jan Naoe SULLIVAN,**[1] **in her capacity as
Director of Land Utilization of the City
and County of Honolulu, and the De-
partment of Land Utilization of the City
and County of Honolulu, Appellees–Ap-
pellees.**

**CONCERNED CITIZENS OF PALOLO,
and Life of the Land, Appellants–
Appellees,**

and

**Zoning Board of Appeals of the City
and County of Honolulu,**
Appellee–Appellee,

v.

**The KOREAN BUDDHIST DAE WON
SA TEMPLE OF HAWAII,**
Appellee–Appellant.

**KOREAN BUDDHIST DAE WON
SA TEMPLE OF HAWAII,**
Appellant–Appellant,

v.

**ZONING BOARD OF APPEALS OF THE
CITY AND COUNTY OF HONOLULU,**
Appellee–Appellee. (Two Cases.)

**KOREAN BUDDHIST DAE WON
SA TEMPLE OF HAWAII,**
Appellant–Appellant,

v.

**ZONING BOARD OF APPEALS OF THE
CITY AND COUNTY OF HONOLULU,
and Concerned Citizens of Palolo, and
Life of the Land, Appellees–Appellees.**

No. 19734.

Supreme Court of Hawai'i.

April 9, 1998.

---

1. Jan Naoe Sullivan has succeeded Donald A. Clegg as director of the Honolulu Department of Land Utilization. Thus, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), she is substituted as a party in this action.

220

Roger S. Moseley, on the briefs, Honolulu, for appellant-appellant Korean Buddhist Dae Won Sa Temple of Hawaii.

Lawrence D. Kumabe, Deputy Corporation Counsel, on the briefs, for appellees-appellees Zoning Board of Appeals of the City and County of Honolulu.

Fred Paul Benco, on the briefs, Honolulu, for appellants-appellees Concerned Citizens of Palolo Life of the Lands.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

At issue in these consolidated appeals is the decision of Donald Clegg, then-Director of the Honolulu Department of Land Utilization (DLU) (the Director), to deny the appellant-appellant Korean Buddhist Dae Won Sa Temple of Hawaii's (the Temple's) application for a variance for its "Main Temple Hall" (the Hall),[2] which had previously been found to exceed the allowable height limit under the zoning code. The Temple filed a total of five appeals in the First Circuit Court from the actions of the Director and the Zoning Board of Appeals (ZBA) related to this issue, all of which were unsuccessful. On appeal to this court, the Temple argues that the circuit court erred because: (1) the Director abused his discretion by failing (a) either to make a declaratory ruling that the Hall was in compliance with the applicable zoning code (b) or to grant the Temple a variance; (2) the Temple was deprived of rights guaranteed by the Hawai'i Administrative Procedure Act (HAPA)—Hawai'i Revised Statutes (HRS) ch. 91—and the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution, in that it was not granted a full trial-like hearing before the Director made his initial decision; (3) a direct appeal lies to the circuit court from variance and other decisions of the Director; and (4) application of the relevant height restriction to the Temple illegally burdened its right to the free exercise of religion, in violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C.2000bb *et seq.*, the first amendment to the United States Constitution, and article I, section 4 of the Hawai'i Constitution.

All of the Temple's arguments are without merit. Accordingly, we affirm.

I. *BACKGROUND*

On September 25, 1986, the Honolulu Building Department issued a building per-

---

**2.** The Director of the DLU referred to the building as the "Cultural Center" in his decision, based, apparently, on the designation in the building permit application. The building is also referred to variously in the record as "The Main Temple Building," "Pulgyomunhwawon," and the "Teaching Hall." The term "Main Temple Hall" is employed both in the Temple's briefing and in its abbot's written testimony to the Director. Out of respect for the Temple's prerogative to name its own buildings, we adopt this designation.

mit to the Temple to expand the construction on its compound (then consisting of several buildings, a courtyard, and statuary) in an "R–5" residential district, located at Waiʻōmoaʻo Road and Helelāʻau Place, Pālolo Valley, City and County of Honolulu. The permit authorized the construction of the Hall, which the Temple expected to use for "offices, [a] library, [a] museum and [an] exhibition room intended to further the understanding of the Korean Buddhist religion." The permit approved the Temple's building plans accompanying its permit request, which indicated that the height of the Hall would be approximately sixty-six feet above grade. No revision of the building plans was ever submitted to the Building Department. When the plans were approved, the Comprehensive Zoning Code (CZC) was in effect. CZC § 21–5.4 (1984–1985 Supp.) allowed a maximum height of twenty-five feet above the "high point of the buildable area boundary line" (HBABL).[3] However, after the Hall was actually built, a DLU inspector determined that an extra floor had been built and that the structure's height was seventy-four to seventy-five feet—nine feet higher than authorized by the

building permit and 6.88 feet higher than the maximum height allowed by CZC § 21–5.4 (i.e., 6.88 feet over the HBABL plus twenty-five feet). Accordingly, the inspector issued a notice of violation on February 23, 1988, ordering the Temple to stop work on the Hall.[4]

The Temple filed its first application for a variance on June 15, 1988. The Director[5] denied the application on September 16, 1988, after a public hearing. The Director noted that, subsequent to the granting of the permit, the CZC was repealed and replaced by the Land Use Ordinance (LUO), which was enacted on October 22, 1986. LUO § 5.40 (1988) provides that the maximum height of buildings in a residential district is thirty feet above grade (and is therefore more restrictive than CZC § 21–5.4, which began its height calculation from the HBABL).[6] The Director ruled that the originally approved height of sixty-six feet, although greater than that allowed under the LUO, would be permitted as "nonconforming" because it had been allowed under the law in effect at the time the building permit was issued. However, he ruled that the

3. CZC § 21–5.4 provides in relevant part:
 **Height Regulations.**
 No portion of any building or other structure located within an R–1 Residential District shall exceed 15 feet in height provided that additional height is permitted if that portion of any structure above 15 feet is set back from any side or rear buildable area boundary line 1 foot for each 2 feet of additional height, said additional setback shall be a continuous vertical plane from the top of the structure to the 15 foot height limit; provided that in no event shall such permitted additional height exceed twenty-five feet above the high point of the buildable area boundary line.... Thus, under this section, the maximum height ever allowed for buildings was twenty-five feet over the highest point of the buildable area boundary line. CZC § 21–5.4 was made applicable to the other residential-zoned districts (R–2 through R–7) by CZC §§ 21–5.12, 21–5.22, 21.5.32, 21–5.42, 21–5.52, and 21–5.62.

4. This violation was only one among a great many zoning and building code violations associated with the Hall's construction. The other violations have apparently been resolved by various means (including, inter alia, the imposition of criminal sanctions on the abbot of the Temple) and are not, therefore, directly implicated in the current appeal. But see infra note 7.

5. At the time of the Temple's first variance application, the Director was John Whalen. Donald Clegg assumed the post on January 2, 1989.

6. LUO § 5–40–2 (1988) provides in relevant part that "[w]ithin ... R–5 districts, all uses, structures and development standards shall be in accordance with Table 8 which follows." Table 8–B provides in relevant part:

 The maximum height of structures shall be determined by the building envelope created as the result of the intersection of two planes. The first plane shall be measured horizontally across the parcel at 25 feet above the high point of the buildable area boundary line. The second plane shall run parallel to grade ... measured at a height of 30 feet. If the two planes do not intersect, then the building shall be determined by the first plane.... Thus, at the most advantageous angle of grade, the maximum height allowed by LUO § 5–40–2 could not exceed the "second plane," which is thirty feet above grade. In amendments subsequent to 1988, the location of the quoted language has been shifted, but its content and import have remained the same. See LUO § 5–40–1(d)(1) (1997).

nine-foot overage, in excess of the authorized sixty-six-foot height, was illegal. The Director further ruled that the Temple had not met the standards for hardship that were required for a variance by the Revised Charter of the City and County of Honolulu (1973) (RCCCH or the City Charter).

The Temple appealed the Director's decision to the ZBA, which affirmed the Director's denial of the variance in an order entered on January 11, 1990. *See Korean Buddhist Dae Won Sa Temple v. Zoning Bd. of Appeals*, 9 Haw.App. 298, 301, 837 P.2d 311, 312, *cert. dismissed*, 74 Haw. 651, 843 P.2d 144 (1992). The Temple filed an appeal of the ZBA's decision in the circuit court on February 16, 1990. *Id.* at 301, 837 P.2d at 312. The ZBA moved to dismiss the circuit court appeal as untimely. *Id.* at 301, 837

P.2d at 312–13. The circuit court denied the ZBA's motion. The ZBA appealed the circuit court's order denying its dismissal motion to the Intermediate Court of Appeals (ICA), vacated the circuit court's order and remanded with instructions to dismiss the appeal as untimely. *Id.* at 301, 306, 837 P.2d at 312–13, 315.

The Temple filed a second variance application for a height overage on February 1, 1993.[7] The Director considered the application "because the rules and regulations pertaining to variance applications permit an applicant to reapply for the same or substantially the same variance one year from the effective date of the denial."[8] Public hearings were held on the 1993 variance application on September 2, 1993 and October 14, 1993.[9]

7. In the argument section of its opening brief, the Temple refers to the citation it received for the side yard setback of the ornamental entry gate (one of the numerous citations not related to the Hall that the Temple received in conjunction with its recent construction, *see supra* note 4) in connection with its variance application. However, this issue was not implicated in the variance application, was not addressed in the Director's findings of fact and conclusions of law, and was not raised in the Temple's appeals to the ZBA. In fact, the "Statement of the Case" set forth in the Temple's own opening brief admits that "Appellant applied ... to the Director of Land Utilization ("Director"), for a variance in 1993, *for the height of the Main Temple Hall only.*" (Emphasis added.)` Furthermore, in a letter sent to the DLU prior to the public hearing on the 1993 variance application, Wendell Marumoto, the Temple's former counsel, wrote: "We concur that the variance application only addresses the height violation at this time." Thus, the issue has been waived on appeal. In any case, the matter of the side yard setback appears to be largely moot, inasmuch as the Temple has acquired an adjoining lot that the parties apparently believe will effectively cure the violation.

8. Presumably, the Director referred to DLU Rules Relating to Administrative Practice and Procedure (RRAPP) Rule 9–8 (1993), which provides in relevant part:

*Reapplication. ...*

(b) If a variance has been denied, a request for the same or substantially the same variance shall not be filed within 365 days from the effective date of denial. If the variance is denied a second time, a further request for the same or substantially the same variance shall not be filed within three years from the effective date of the second denial.

9. Prior to the hearings, on August 27, 1993, the Temple also filed suit in the circuit court (Civil No. 93–3345–08), requesting a declaration that the Director was required to provide a trial-like contested case hearing. On August 30, 1993, the Temple filed a motion for a temporary restraining order (1) blocking the Director from holding public hearings until (a) the Temple had had sufficient time to prepare for the hearings and (b) pursuant to HRS ch. 91, the DLU had adopted appropriate rules for variance applications and (2) requiring the Director to hold a contested case hearing. The motion was denied. After over a year of inactivity, the lawsuit was dismissed by the circuit court on April 4, 1997, pursuant to the provisions of Rules of the Circuit Courts Rule 12(q).

The Temple recently filed another lawsuit against the City and County of Honolulu, which is apparently pending in the circuit court (Civil No. 96–2134–05) "for declaratory and injunctive relief and damages for violation of state and federal constitutional rights as well as statutory provisions."

In addition, the Temple filed suit in federal court (Civil No. 95–00427 ACK), requesting "declaratory and injunctive relief and damages for violation of federal constitutional rights as well as statutory provisions of RFRA." On June 24, 1996, the federal district court partially granted the City and County of Honolulu's motion for summary judgment on abstention grounds. *See Korean Buddhist Dae Won Sa Temple of Hawaii v. City and County of Honolulu*, 952 F.Supp. 679 (D.Haw.1996).

"Concerned Citizens of Palolo" and "Life of the Land" have filed suit in the circuit court (Civil No. 88–2217–07) against the Temple to enforce compliance with the building and zoning codes. This lawsuit is also pending.

Despite the Temple's insistence that it was entitled to a trial-like "contested case" hearing, the hearings officer (HO) treated the hearings as "public," allowing all witnesses to testify briefly without being subject to direct or cross-examination. The HO denied the Temple's repeated requests to cross-examine witnesses, but allowed the Temple to proffer rebuttal witnesses and arguments. In addition to the legal argument by counsel, fifty-three witnesses testified in support of the Temple's application, and twelve spoke in opposition, including representatives of the neighborhood organizations, "Concerned Citizens of Palolo" and "Life of the Land." Numerous letters, written statements, photographs, charts, and other exhibits, including evidence that other Buddhist temples in Korea and Hawai'i are not as large as the Hall and copies of a petition in support of the variance request allegedly signed by over 15,000 people.

Abbot Dae Won Ki, the spiritual leader of the Temple, introduced written testimony, in which he explained the importance of the design of the Hall and other Temple buildings to the ritual uses required by the Chogye Order of Korean Buddhism. After summarizing the history and some of the tenets of Buddhism, the abbot noted that the Temple is "dedicated ... to help spread the message of enlightenment, end suffering and promote world peace." When he first encountered the land on which the Temple was eventually built, Abbot Ki

knew immediately that this place was the right place. It was uniquely suited to the Temple in every respect. It was rectangular, just the shape for the compound we had in mind. It was on a fairly steep hillside which meant that the parking structure could be placed under part of the compound rather than in plain view. The land also had something else which none of the other parcels I had seen possessed. This land gave the feeling that it was a holy place. In 1979 we were able to purchase the land, of which the Zen Master also approved, calling the mountain behind it "Botah San."

Abbot Ki explained that the Temple's architectural components have "a special purpose and meaning and the compound is organized in a very special way, each of the elements having a harmonious relationship with the other." He elaborated that

[o]ur Buddhist order emphasizes meditation and all of the buildings and other parts of the Temple compound are very sensitively designed to be in balance and harmony with each other and the mountains which surround the Temple. The individual [b]uildings[,] and the individual parts of the buildings, serve more than a secular purpose[;] they add up to a whole, more like a religious work of art. Removing the peak of the roof of the Main Temple Hall would be comparable to removing the hand of God from Michelangelo's painting on the ceiling of the Sistine chapel, or the head of Mary on the Pieta. This balance and harmony is an integral part of the religious teaching and experience which leads to Enlightenment. The Main Temple Hall is an integral part of this balance and harmony[;] it is not too tall and it is not too short[;] it is as it should be.

Finally, Abbot Ki stated that traditional Korean "temple builders" had been brought in from Korea to design and construct the project after the initial plans had been submitted to the Building Department. In order to "create the necessary balance and harmony" the builders had altered the plans and, thus, had extended the Hall to its present height. Describing the act of reducing the height of the Hall as a "desecration of the worst kind," the abbot asserted that it would also cause extreme financial hardship to the Temple.

Many other witnesses testified similarly that it would be a spiritual violation to cut off the roof of the Hall, which they described as an object of great architectural beauty as well as a religious center. The Temple likewise adduced the testimony of a number of architects and academics, who echoed the points emphasized by Abbot Ki. These included Jon Shimizu, who testified that reducing the size of the Hall would cost approximately one million dollars and would require a year or more to accomplish. Jack J. McGarrity, another architect, testified that the arched shape and size of the Temple roof

was integral to the identification and spiritual significance of the building:

> [W]here in a Christian church we have a spire or a steeple with a cross on it or in a Jewish synagogue we have a dome, a minaret in the eastern religion, in the Buddhist faith it is the church roof itself. It is the building and it is the proportions thereof that constitute[ ] its identification.

A third architect, Ben T. Torigoe, testified, *inter alia,* that new data had determined that the HBABL was higher than that indicated by the surveys performed prior to the initial 1988 variance application. According to the new data, the Hall was only 2.7 feet over the maximum height allowed by the CZC.

Those testifying in opposition to the variance voiced a number of complaints, ranging from damage, noise, pollution, and other interference with their property—all of which had resulted from the sustained construction on the Temple site—to parking congestion and the effects of the imposing size of the Hall, including loss of views, declining property values, and a sense of being overshadowed in their homes and yards.

In its "Memorandum in Support of Variance," the Temple argued, *inter alia,* that it was entitled to a variance because: (1) it satisfied the three hardship conditions outlined in the City Charter; (2) application of the zoning laws would infringe upon the Temple's right to the free exercise of religion; (3) the Hall roof was a spire or was sufficiently "spire-like" to fall within a height exception contained in the zoning laws.

The Director filed his written "Findings of Fact, Conclusions of Law and Decision and Order" on December 1, 1993, denying the Temple's application for a variance. (Case No. 93/VAR–3). Citing LUO § 3.120,[10] the Director again ruled that the Hall was authorized to stand at a maximum of sixty-six feet tall as a "nonconforming" but permitted height because the Temple's permit had originally been granted while the CZC was in force. He found that the actual height of the Hall was between seventy-four and seventy-five feet.[11] He then examined the facts in light of the three findings required for the issuance of a variance outlined in RCCCH § 6–910:(1) that without the variance the applicant would be denied reasonable use; (2) that the hardship is based on unique circumstances; and (3) that the variance does not alter the essential character of the neighborhood or act contrary to the intent and purpose of the zoning ordinance.[12]

With respect to the first factor, the Director found that the Temple would have reasonable use of its land without a variance. He rejected Torigoe's testimony and documentation purporting to "clarify" the actual height of the HBABL, noting that the survey data had not itself been introduced and that

10. LUO § 3.120 (1990) provided in relevant part:
**Nonconformities**
*Nonconforming lots, structures, uses, dwelling units* and *parking* may be continued, subject to the following provisions:
. . . .
B. Nonconforming Structures.
. . . .
3. Any nonconforming structure may be repaired, expanded or altered in any manner which does not increase its nonconformity. (Emphases in original.)

11. We note that although the record indicates that the building inspector found the Temple to exceed the CZC limits by *6.88* feet as noted above, the Director refers to that excess as *6.2* feet in his decision. Inasmuch as, on appeal, the Temple has conceded that the Hall exceeded the CZC limits (although the exact amount by which it exceeded that height was disputed below), this apparent inconsistency is immaterial to our analysis.

12. RCCCH § 6–910 provides:

**Zoning Variances—**
The director shall hear and determine petitions for varying the application of the zoning code with respect to a specific parcel of land and may grant such a variance upon the ground of unnecessary hardship if the record shows that (1) the applicant would be deprived of the reasonable use of such land or building if the provisions of the zoning code were strictly applicable; (2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so that the reasonableness of the neighborhood zoning is not drawn into question; and (3) the request, if approved, will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance. Prior to the granting of any variance, the director shall hold a public hearing thereon. The director shall specify the particular evidence which supports the granting of a variance.

it was "possible some fill material may have been placed on the site" during the five-year interval between the original and subsequent surveys.[13] He reasoned that the Temple "would have enjoyed a substantial height nonconformity if [it] had built according to approved plans[.]" He also rejected the Temple's argument that because the code permits additional height for rooftop mechanical equipment, spires, flagpoles, and smokestacks, the same exception should be extended to the Temple's roof. He ruled that the Temple's wide roof could not be compared to the narrow protrusions of the enumerated permitted uses. The Director further rejected the Temple's religious, architectural, and historical arguments that the roof must be higher than originally permitted, noting that the Temple itself had initially submitted plans calling for a height no greater that sixty-six feet. He also found that there was no apparent necessity for all the proposed functions of the building to be consolidated into one main building rather than two or more smaller ones.

Regarding the second factor, the Director ruled that no unique circumstances had been demonstrated. He found that the topographical conditions were not unusual for the neighborhood. He also rejected the Temple's arguments that it would be especially costly to lower the roof, reasoning that the hardship was self-created.

Finally, with respect to the third factor, and relying on the opposition testimony of neighbors and the considerable height of the building, the Director ruled that the height overage altered the essential residential character of the neighborhood. He acknowledged that "the applicant has raised a number of constitutional concerns. However, these concerns are not related to the 3 conditions of hardship established by the Charter, and, hence, are beyond the scope of the Director's review of a zoning variance."

Accordingly, the Director denied the Temple's variance application and ordered removal of that portion of the Hall exceeding sixty-six feet in height.

After the hearings on its second variance application, but before the Director's decision was filed, the Temple filed a petition for a declaratory ruling from the Director that the height of the Hall and the setback of the compound's ornamental gate[14] did not violate the applicable zoning code. The Temple argued that the Hall's roof is a "spire" or is sufficiently "spire-like" that the height exemptions contained in the CZC and the LUO that are applicable to "spires" should apply. It also argued that, in order to interpret the zoning laws in conformity with the constitutionally guaranteed right of the free exercise of religion, the Director was obliged to find that the Temple's height was lawful. The Director declined to enter the requested declaratory ruling, stating that "the Petition raises substantially the same legal and constitutional issues that have been raised in the Temple's variance petition. Those issues, we believe, will soon be the subject of a ZBA appeal, and possible court review." In connection with his ruling, the Director relied on DLU Rules Relating to Administrative Practice and Procedure (RRAPP) Rule 3–5(3) (1993), which authorizes him to refuse to enter a declaration where "[t]he issuance of a declaratory ruling may adversely affect the interests of the city in any litigation which is pending or may reasonably be expected to arise."

The Temple appealed the Director's decision and order regarding its request for a variance (Case No. 93/ZBA–8) and his refusal to issue a declaratory ruling as to the legality of the Hall's size (Case No. 93/ZBA–11) to the ZBA on December 23, 1993 and December 30, 1993, respectively.[15] Two community

---

13. The Temple has not raised the issue of this discrepancy in data in its appeal to this court. In any case, there is nothing obvious in the record indicating that the Director's view of the weight of the conflicting evidence on this issue was clearly erroneous.

14. *See supra* note 7.

15. Despite appealing the Director's order of the variance to the ZBA, the Temple noted in its memorandum to the ZBA that,

by filing [its] petition, petitioner-appellant does not waive any rights nor concede that the Zoning Board of Appeals has jurisdiction to hear an appeal from the action of the Director with respect to the denial of an application for

organizations, "Concerned Citizens of Palolo" and "Life of the Land" (collectively, Concerned Citizens) intervened in the Temple's appeals. In addition, Concerned Citizens appealed that portion of the Director's decision in which he ruled that the Hall would be permitted to remain sixty-six feet in height as a nonconforming use (Case No. 93/ZBA–9). The Temple intervened in this appeal. The Temple also appealed the Director's decision and order on its variance application and his refusal to issue a declaratory ruling directly to the circuit court (Civil No. 93–5050–12) on December 30, 1993, arguing that no appeal lay to the ZBA under the City Charter.

The ZBA held consolidated hearings on the Temple's and Concerned Citizens' appeals over six dates between February 17, 1994 and July 14, 1994. At a pre-hearing scheduling session, the Temple asked the ZBA whether it considered the hearing to be a "contested case hearing" and whether the Temple would be allowed to introduce new evidence. The Chair of the ZBA confirmed that the ZBA considered the hearing to be a contested case hearing, but ruled that the ZBA would not "accept any new evidence because we're looking to see if the Director was arbitrary and capricious based on the facts known to him at the time he made his decision."

In the course of the ZBA hearings, the parties were permitted to call and cross-examine witnesses. Nevertheless, the Temple declined to call any witnesses, opting instead to present its case through the documentary record and through cross-examination of the City's witnesses (all of whom were employees of the DLU). On cross-examination, the Director testified that his staff had proffered evidence to him that had not been formally introduced at the public hearing conducted by the HO and that this was common practice:

Q (By [the Temple's counsel:]) The bottom line, though[,] is that evidence was considered that didn't—that wasn't introduced at the hearings officer's hearing.

a variance under the Revised Charter of the City & County of Honolulu Section 6–910.

A There's lots of evidence that was considered that wasn't introduced at the hearings officer's—

Q What other kind of evidence?

A Anything that's submitted. We're not in a court of law when we're doing this. We accept documents from the neighborhood. We accept documents from anybody who wants to submit them to us. The public hearing is a requirement by law, and those who wish to participate in that may; but that's not the only information we use. That would be terrible. We're not in a court of law.

. . . .

Q ... Is there any provision that you have in the way you operate that allows an applicant to address things that you're considering that the applicant doesn't know you're considering?

A The applicant can review the files at any time.

Q How does the applicant know what you're considering?

A If the applicant's concerned, they'll go and review the files and find out what's in there.

Among the items submitted to the Director by his staff in connection with the Temple's variance application were "drawings in ·a book that related to Buddhist religion in Korea," the title and author of which the Director could not remember. These drawings purportedly suggested that the teachings of Buddhism did not require the Hall to be of the height to which it was built. Additionally, the staff had undertaken to proffer testimony regarding the nature of Buddhism, to be given by a "qualified individual." The Director testified that his staff had brought this testimony to his attention in response to the Temple's evidence on the subject, but that he had not actually considered it in making his decision and, for that reason, had decided not to make it part of the record:

These are things that they ... mentioned to me and showed me, but they are not part of the file ... because the reli-

(Emphasis and upper case deleted.)

gious aspects of this building are not at issue in the variance.

You brought it up as it were, but in my opinion in looking at the charter and looking at the criteria for judgment, the religious significance of the structure, the height or the things that you mentioned is not a factor in my . . . giving a variance or denying a variance. . . . The religious aspects of this, regardless of what they are, had no bearing on the variance.

The ZBA Chair sustained the City's objection to the Temple's continued examination as to the identity of the "qualified individual," on the basis that the Director had not considered the matter in rendering his decision.

The ZBA rejected the positions advanced in both of the Temple's appeals, as well as those taken in the appeal of Concerned Citizens, entering findings of fact and conclusions of law similar to those of the Director. The parties appealed the ZBA's "Findings of Fact, Conclusions of Law, and Decision and Order" in all three cases to the circuit court. In addition, the Temple filed yet another [16] appeal of the denial of its variance, as well as of the ZBA's decision in Concerned Citizens' appeal [17] in the circuit court, raising largely the same arguments as in its other appeals.

On March 5, 1996, the circuit court filed orders rejecting all five appeals. First, the circuit court dismissed the Temple's appeal to it of the Director's order declining to issue a declaratory ruling, on the basis that it lacked jurisdiction to hear it. The circuit court further ruled that HAPA did not require *the Director* to hold a contested case hearing on variance applications under HAPA; instead, the "contested case hearing" prescribed by HRS ch. 91 transpired during the proceeding in the ZBA.

Second, the circuit court rejected Concerned Citizens' contention on appeal, ruling that the Director's finding that the Hall could be constructed to a height of sixty-six feet as a lawful nonconforming use was "neither arbitrary and capricious, nor an abuse of discretion or an erroneous finding of material fact" because (1) the Temple's building permits were still "open," and (2) the ZBA was bound, under the doctrine of collateral estoppel, by its earlier decision affirming the Director's finding in connection with the Temple's first variance application (ZBA Case No. 88/ZBA–66).

Third, the circuit court rejected the Temple's challenge of the ZBA's order affirming the Director's denial of its variance application, ruling that: (1) the Temple had failed to establish that it had met the three hardship conditions prerequisite to the issuance of a variance, pursuant to RCCCH § 6–910; (2) any hardship suffered by the Temple was self-created; (3) the Temple had failed to establish the facts necessary to support its claim of equitable estoppel; (4) with regard to its claim related to the free exercise of religion, (a) the Temple had failed to adduce sufficient facts to establish that the applicable provisions of the zoning code imposed a "substantial burden" on its members' religious beliefs, for purposes of RFRA and the first amendment to the United States Constitution, (b) the unauthorized addition to the Hall served a clearly secular—and not a religious—purpose and constituted an intentional violation of the zoning laws, and (c) the City's zoning laws had a clearly secular purpose and served a compelling governmental interest; and (5) the Hall's roof was not a "spire," within the meaning of the zoning code.

Fourth, the circuit court found (1) that "[t]he overwhelming weight of the evidence support[ed]" the denial of the Temple's variance application and (2) that "the Temple's representatives had engaged in deceitful and 'bad faith' conduct."

And fifth, the circuit court expressly approved the ZBA's order affirming the Di-

---

**16.** As noted above, an earlier and fourth appeal was filed directly in the circuit court after the Director's initial decision regarding the 1993 variance application.

**17.** Although the Temple seems to have prevailed on the issue raised by Concerned Citizens (*i.e.,* whether the Director was allowed to rule that the height of the Hall can exceed the LUO requirements as a nonconforming use), it apparently decided to appeal the decisions of the ZBA and the circuit court on this question anyway.

rector's refusal to issue a declaratory ruling, concluding that

[i]t was neither arbitrary and capricious nor an abuse of discretion or an erroneous finding of material fact for the ZBA to find that the Director properly refused to issue a declaratory ruling ... where, as is the case here, the issues raised in the declaratory ruling petition were identical or nearly identical in substance to the issues being litigated in the variance appeal.

The Temple timely appealed all five orders on March 18, 1996 (including Concerned Citizens' appeal from the ZBA's order, although Concerned Citizens did not itself appeal the circuit court's order, *see supra* note 17).

## II. *STANDARDS OF REVIEW*

### A. *Agency Decisions*

■ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Bragg v. State Farm Mutual Auto. Ins.*, 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996) (quoting *University of Hawai'i Professional Assembly v. Tomasu*, 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995)). HRS § 91–14(g) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). "Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Bragg*, 81 Hawai'i at 305, 916 P.2d at 1206.

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997).

### B. *Interpretation Of A Statute, Ordinance, Or Charter*

■ "[T]he interpretation of a statute[, ordinance, or charter] is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997).. Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which

is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Cullen*, 86 Hawai'i 1, 8–9, 946 P.2d 955, 963–64 (1997) (some brackets in original and some added.

### III. *DISCUSSION*

A. *The Director Did Not Act In An Arbitrary Or Capricious Manner, Or In A Manner Characterized By Either Abuse Of Discretion Or Clearly Unwarranted Exercise Of Discretion By Failing To Issue A Declaratory Ruling Or By Failing To Grant The Temple's Variance Application.*

1. *The Director rightly refused to issue a declaratory ruling.*

█ The Temple argues that the Director was "arbitrary and capricious" in refusing to render a declaratory ruling on the issue whether the Hall actually complied with the zoning laws. It reasons that such a ruling might have made the variance proceedings unnecessary and that there was no showing that such a ruling would have resulted in "any potential adverse effect."

RCCCH § 6–903 provides in relevant part that "[t]he director of land utilization shall: . . . [b]e charged with the administration of the zoning and subdivision ordinances and rules and regulations adopted thereunder and any regulatory laws or ordinances which may be adopted to supplement or replace such ordinances." RRAPP ch. 3 sets forth rules regarding the procedure for requesting a declaratory ruling from the Director. RRAPP Rule 3–1 provides that "[a]ny interested person may petition the director for a declaratory ruling as to the applicability of any statute or ordinance relating to the department, or of any rule or order of the department." RRAPP Rule 3–5 authorizes the Director to refuse to issue a declaratory ruling if, *inter alia*, "[t]he issuance of the declaratory ruling may adversely affect the interests of the city in any litigation which is pending or may reasonably be expected to arise" or "[f]or other good cause."

In this case, the Director refused to issue a declaratory ruling because the issues raised by the Temple were "substantially the same" as those being litigated in connection with its variance application and would "soon be the subject of a ZBA appeal, and possible court review."

On review of the Temple's petition, it cannot be said that the Director's finding that the issues raised were "substantially the same" as those relating to the variance application was clearly erroneous. Although the arguments are framed slightly differently, as in the variance application, the Temple argued in its petition that (1) the Hall is a "spire" or sufficiently "spire-like" to fall into the height exceptions of CZC § 21–2.4 and/or LUO § 3.60(c) and (2) the United States and Hawai'i constitutional guarantees of free exercise of religion "require that the provisions of the CZC and the LUO be applied to the Temple structures in a manner that is not

more restrictive than other structures permitted within the same zoning district."

Neither can it be said that the Director's prediction regarding future appeals to the ZBA and the circuit court were clearly erroneous. It would be reasonable to anticipate an appeal of any denial of a variance application. In this case, the Director's apprehension was all the more justified, in light of the Temple's strident rhetoric and flamboyant public campaign in support of its application. For example, in the Temple's "Memorandum in Support of Variance," submitted to the Director himself, the Temple accuses the Director of prejudging the case based on quotations from a newspaper article, complaining that "[t]he quandary with which the [Temple] is left is that the very city official who is empowered to grant variances has a publicly stated, but illegal, policy which will operate to deny the variance requested, regardless of whether the [Temple] is legally entitled to a variance." Apart from having questionable value in persuading the Director to favor the Temple's cause, such a statement would have reasonably induced the Director to believe that the Temple would appeal any negative decision regarding its variance application.

The Temple is theoretically correct that a declaratory ruling that the Hall was not in violation of the zoning laws might have saved time and expense by avoiding the need for an analysis of the factors justifying a variance. However, such conservation of resources would only have been achieved had the Temple requested the declaratory ruling *before* filing two applications for a variance, thereby itself precipitating the very analysis it claims to be seeking to avoid. The Temple advanced arguments regarding the legality of the Hall's height in its 1993 variance application and engaged in numerous lengthy public hearings on the subject before filing its petition for a declaratory ruling. Thus, it had *already* placed these issues on the table in variance proceedings, and the Director was correct in concluding that it would be a waste of time and effort to duplicate his consideration of the same issues in the context of a request for a declaratory ruling. Nothing in the City Charter or the RRAPP forbids the Director from considering arguments that

there has been no zoning violation in a consolidated proceeding with a request for a variance. Indeed, as a general matter, allowing the resolution of these matters in one proceeding makes practical sense because duplication of effort and waste of time are minimized.

The Director's decision clearly comported with RRAPP Rule 3–5. The Temple has not challenged the validity of that rule. Thus, the Director did not act arbitrarily or capriciously in refusing to issue a declaratory ruling in this case.

2. *The Director's ruling that the Hall was in violation of the applicable zoning laws and his denial of the variance were justified.*

a. *the Hall roof is neither a "spire" nor "spire-like"*

 The Temple argues that the Hall is not in violation of the applicable zoning laws because (1) its roof is a spire or sufficiently "spire-like" to fall within height exceptions contained in the CZC and/or the LUO and (2) the zoning laws must be read consistently with the mandates of the free exercise clauses of the United States and Hawai'i constitutions. However, inasmuch as the height restrictions as applied in this case do not infringe upon the free exercise of religion of its members, under either the United States or Hawai'i constitutions, *see infra* section III.D, the Temple's second argument is not addressed here.

LUO § 3.60(c) (1990) created several specific exemptions from the maximum height of buildings in residential areas. That section provided in relevant part:

The following structures shall be exempt from zoning district height limits under the specified restrictions:

1. Vent pipes, fans, chimneys, and structures housing or screening elevator machinery and other similar rooftop machinery.

2. Safety railings not to exceed 42 inches above the governing height limit.

3. Utility poles, radio and television mast antennas, but not dish anten-

nas, not to exceed 500 feet from existing grade. Other mast antennas shall not exceed 25 feet above the governing height limit.

4. *Spires,* flagpoles and smokestacks, *not to exceed 350 feet from existing grade.*

5. One (1) antenna for an amateur radio station operation per zoning lot, not to exceed 90 feet above existing grade.

6. Wind machines, where permitted, provided that each machine shall be set back from all property lines one foot for each foot of height, measured from the highest vertical extension of the system.

7. Any energy-savings device, including heat pumps and solar collectors, not to exceed five feet above the governing height limit.

. . . .

(Emphases added and emphases in original deleted.)[18] Similarly, CZC § 21–2.4 exempted from its height limits "structures housing or screening elevator machinery, vent pipes, and fans, safety railings, residential chimneys, residential radio or television antennas, spires, flagpoles or monuments otherwise approved for erection. . . ."[19]

The Temple argues in the alternative that (1) the Hall's "double-pointed ornamental roof" is a "spire" for purposes of the zoning law, and (2) insofar as the LUO and CZC's list of exemptions "should be construed as a general category of exceptions rather than as specific and unique exceptions," the Hall's roof fits within this "generic category of exceptions."

■■■■ Neither the CZC nor the LUO defines the term "spire."

Zoning ordinances are in derogation of the common law, and their provisions must be strictly construed. Nevertheless, the terms of a zoning ordinance should be accorded their natural and most obvious meaning when there is no manifest legislative intent contrarywise. In interpreting a zoning ordinance, the duty of this court is to ascertain and give effect to the intent of the Honolulu city council. . . .

*State v. Lum,* 8 Haw.App. 406, 410, 807 P.2d 40, 43, *cert. denied,* 72 Haw. 619, 841 P.2d 1075 (1991) (citations and internal quotation signals omitted). Revised Ordinances of Honolulu (ROH) § 1–2.1 (1990) provides in relevant part:

(a) General Rule. All words and phrases shall be construed and understood according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in the law shall be construed and understood according to such peculiar and appropriate meaning.

(b) Construction of Ambiguous Words. Where the words are ambiguous:

(1) The meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

(2) The reason and spirit of the ordinance, resolution, rules and regulations, and the cause which induced enactment or promulgation may be considered to discover its true meaning.

(3) Every construction which leads to an absurdity shall be rejected.

The Temple's contention that the Hall's roof is a "spire" is at odds with the common

---

18. The 1990 version of LUO § 3.60 was in effect when the Temple filed its second application for a variance. That section has been amended subsequent to 1990, but not in any material respect. *See* LUO § 3.60 (1997).

19. We note that the LUO is the applicable law in this case, because the violation at issue (*i.e.,* building the Hall in excess of the maximum allowable nonconforming height) occurred after the enactment of the LUO, which was made effective on October 22, 1986. However, the provisions of the CZC could potentially have been relevant, had they differed from those of the LUO, as a basis for a prior nonconforming use. Nevertheless, there does not appear to be any material difference between the two ordinances as they apply to the issue whether the Hall roof could be considered a "spire" or "spire-like."

usage of the term. "Spire" is not an ambiguous or technical term. The definition that the Temple itself cites from Webster's New Twentieth Century Dictionary, *i.e.* "'anything that tapers to a point as a pointed tower or steeple,'" highlights the generally understood quality of a spire as a steeply rising, tall structure. Although the Hall's roof does taper, it does not do so in the manner of a tower or steeple. The Temple itself describes the Hall's roof as

> saddle shaped with a pointed peak and ornamental cap at either end. Down the center line of the roof is an ornamental blade or ridge which rises more than three feet from the traditional tile covering. The mid-section of the roof at the tile level is almost six feet lower than the ornamental peak at either end. The roof rises in a complex curve over 22 feet from the bottom of the eaves to the peaks at either end.

"Spires" are not "saddle shaped" and do not feature an "ornamental blade or ridge" according to their popular signification. Construing the ordinance strictly, this court cannot agree with the Temple's suggestion that the Hall's roof is a "spire."

Even if "spires" were chameleonic, it is clear from the context of the "spires" exemption in the zoning laws that "spires" are understood to be tall, narrow extensions of a primary structure. This can be seen by comparing the "spires" exemption with others detailed in the LUO and CZC—including antennae, chimneys, vent pipes, utility poles and flag poles—all of which are tall, narrow extensions, generally of a primary structure. Clearly, the "reason and spirit" behind creating these exemptions was to allow for minor intrusions on height regulations—rather than a wholesale abandonment of them simply because the primary structure in question happens to be "pointed." Such a construction would lead to an absurdity.

The same reasoning undermines the Temple's argument that the Hall's roof is "spire-like" because there is no evidence that the LUO or the CZC contemplated exempting such a wide structure. Moreover, pursuant to the canons of statutory construction, the Temple's assertion that the LUO's and CZC's lists of specific exemptions are merely suggestive of some generic, uncircumscribed, limitless, and undefined universe of "like" structures is patently implausible. In essence, it is the inverse of the long-accepted canon, *expressio unius est exclusio alterius,* meaning that the mention of one thing implies the exclusion of another. *See, e.g., Kelipuleole v. Wilson,* 85 Hawai'i 217, 222–23 n. 6, 941 P.2d 300, 305–06 n. 6 (1997); *State v. Cornelio,* 84 Hawai'i 476, 495 n. 33, 935 P.2d 1021, 1038–39 n. 33 (1997); *State v. Arceo,* 84 Hawai'i 1, 29 n. 38, 928 P.2d 843, 872 n. 38 (1996); *International Sav. and Loan Ass'n v. Wiig,* 82 Hawai'i 197, 200, 921 P.2d 117, 120 (1996).

The only authority the Temple cites in support of its argument is a 1951 decision of the New Jersey Supreme Court interpreting exemptions from the height limitations of a local zoning ordinance. *See Wright v. Vogt,* 7 N.J. 1, 80 A.2d 108 (1951). In that case, the plaintiff had been forbidden from erecting a structure supporting a radio antenna on top of his home because of a height restriction in the zoning code of his borough. *Id.,* 80 A.2d at 109. The *Wright* court noted that the zoning code's height regulations specifically exempted "church steeples, chimneys, or flagpoles." *Id.* at 110. The *Wright* court asserted the following interpretative principle:

> It is the general rule that exceptions in a legislative enactment are to be strictly but reasonably construed. But this rule, like all canons of interpretation, yields to the intention revealed by context. The inquiry in the final analysis is the true intention of the law; and, in the quest for the intention, the letter gives way to the obvious reason and spirit of the expression.

*Id.* (citations omitted). Without further analysis, the *Wright* court then held that

> it would be utterly unreasonable to hold that structures of like kind and degree are not within the exception because not within the letter. That view would violate the spirit of the exception; and disserve the true intention disclosed by the regulation as a whole. Indeed, it is apparent that radio and television antennae were not within the contemplation of the local law-

makers when the ordinance was adopted; and it is equally clear that they are not within the letter of the by-law when considered as an entirety. It seems reasonably clear that the words of exclusion in the exception have a generic rather than a specific connotation. Only thus can the exception be read as not unduly discriminatory in relation to the purposes to be served by zoning, assuming that aesthetic considerations alone would sustain a use restriction such as is asserted here.

*Id.* at 111 (citations omitted).

As the *Wright* court seems to be implying, we have also acknowledged that the *expressio unius* doctrine is not absolute. *See Wiig,* 82 Hawai'i at 201, 921 P.2d at 121 ("The maxim, *expressio unius est exclusius alterius,* exists only as an aid to statutory interpretation and its application should be limited to ascertaining legislative intent which is not otherwise apparent." (Citation omitted.)); *see also Wilson,* 85 Hawai'i at 222–23 n. 6, 941 P.2d at 305–06 n. 6. Here, however, there is no "otherwise apparent" legislative intent regarding the "generic" or "specific connotation" of CZC § 21–2.4 and LUO § 3.60(c). Moreover, in contrast to *Wright,* the disputed structure in the present case is nothing like any of the specifically exempted structures. Indeed, it would seem to "violate the spirit" of the statutes more flagrantly to allow an exemption for the large "saddle shaped" roof of the Hall than to exempt it. Lastly, and evidently in contrast to 1950s New Jersey, an aesthetic purpose behind height regulations is perfectly acceptable in Hawai'i. *See* LUO § 1.20(B) (1990) (describing the purpose of the LUO as, *inter alia,* "conserving the city's . . . scenic resources and encouraging design which enhances the physical form of the City.") Hence, to the limited degree that *Wright* might have served as persuasive authority, it is easily distinguished from the case at bar.

There was competent evidence in the record supporting the Director's finding that the Hall was seventy-four to seventy-five feet tall. No exemption to the height restrictions from the LUO or CZC applies. Therefore, we hold that the Director's finding that the Hall violates the zoning laws' height limitations was not clearly erroneous.

### b. *the Director did not abuse his discretion by denying the Temple's variance request*

RCCCH § 6–910 enumerates the three conclusions of law that the Director must enter in order to grant a variance "upon the ground of unnecessary hardship." Those conclusions are that

(1) the applicant would be deprived of the reasonable use of such land or building if the provisions of the zoning code were strictly applicable; (2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so that the reasonableness of the neighborhood zoning is not drawn into question; and (3) the request, if approved, will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance.

The burden of establishing the factual foundation for the foregoing legal preconditions rests with the applicant. *See McPherson v. Zoning Bd. of Appeals,* 67 Haw. 603, 607, 699 P.2d 26, 28 (1985).

With regard to the first of the criteria, the Temple essentially argues that its religious needs mandated the height of the Hall to be as ultimately built in order to maintain the necessary "balance and harmony" of the compound.[20] It further argues that it would be an act of desecration to remove the roof of the Hall.

However, "reasonable use" of the land, within the meaning of the City Charter, is not necessarily the use most desired by the owner. *See* Final Report of the Charter Commission of the City and County of Honolulu 1971–1972 at 33 ("The fact that [an applicant] might make a greater profit by

---

**20.** The Temple also injects its constitutional analysis of free exercise of religion. The constitutionality of the City Charter's provisions and the Director's application of them is, however, extraneous to our present analysis. Accordingly, we address the constitutional question *infra* in this opinion.

using his property in a manner prohibited by the ordinance is considered irrelevant, since almost any individual applicant could make that same showing; the greater profit for that individual would be siphoned off from the value of all his neighbors' properties.") For example, in *McPherson*, a pig farmer requested a variance in order to enlarge a nonconforming "piggery." *Id.* at 603, 699 P.2d at 27. This court held that McPherson had failed to show that he could make no reasonable use of the land without expanding his piggery. *Id.* at 606, 699 P.2d at 28.

Similarly, the Temple has failed to establish that it could make no reasonable use of the land or its Hall without building the Hall to a height of seventy-five feet. The record indicates that the Temple itself initially submitted plans reflecting a construction design for the Hall of sixty-six feet in height. Assuming that this was the result of some kind of spiritual mistake, it is unclear why the requisite "balance and harmony" could not have been achieved by changing the plans for all of the buildings within the compound. Even accepting the Temple's dubious argument that no religious use can be made of the compound if the Hall is not permitted to remain at a height of seventy-five feet, the problem was clearly self-created. The Temple was not forced to purchase the land in a residential neighborhood in the first place, nor need it have constructed its other buildings to such a height that, in order for the "balance and harmony" of the compound to be fully maintained, it became necessary for the height of the tallest structure to exceed that permitted by law by over forty feet. *See* Final Report of the Charter Commission of the City and County of Honolulu 1971–1972 at 33 ("The Commission believes that the hardship [required for a variance] must not result from the applicant's own actions, such as the purchasing of property with the knowledge that the zoning ordinances prevent him from using it in the way he desires.") It is telling that Abbot Ki's own description as to why the particular plot of land at issue was perfect for the new Temple focused first on the opportunities for a parking garage and only second on his impression that it was a "holy place." On balance, then, the Director's conclusion that the Temple would have reasonable use of the land without a height variance was not an abuse of discretion.

■ With regard to the second of the criteria, the Temple's argument, although less than clear, is apparently based on Abbot Ki's observations of the shape of the parcel, its size, the feasibility of a parking garage, the parcel's proximity to mountains, and the sense of holiness that he experienced viewing it. Although these considerations undoubtedly motivated the Temple's decision to purchase the plot, they have nothing to do with the second prong of the criteria set out in the City Charter. By its plain language, the "unique circumstances" prong has to do with whether specific attributes of the particular parcel are present that justify the request for a variance. The evidence in the record reflects that there was nothing in the grade or orientation of the plot that was unusual for the neighborhood. Thus, an owner's unusual plans for a parcel do not, in themselves, generate "unique circumstances." *Cf. McPherson*, 67 Haw. at 606, 699 P.2d at 28 ("[I]t is questionable if appellee's violation of the zoning ordinance can constitute a 'unique' circumstance as a matter of law.") Thus, the Director's ruling that the second of the criteria prescribed by the City Charter had not been satisfied was not an abuse of discretion.

■ Finally, the Temple argues that the testimony of its expert at the public hearing demonstrated that the essential character of the neighborhood would not be altered. The Temple also opines that the neighborhood sports a "hodge podge of mixed uses" that "welcomes diversity" and that it is "older and tends to be less than well maintained" in contrast to the "striking beauty" of the "new[ ]" Temple Hall. Notwithstanding the Temple's low opinion of the neighborhood, there was evidence before the Director that a number of neighbors felt oppressed by the height of the Hall, did not find it "strikingly beautiful," and resented its presence; moreover, there was no question that the Hall was the tallest and largest building in the area. Thus, there was sufficient evidence to support the Director's finding that the additional height did, in fact, alter the essential charac-

ter of the neighborhood, and he did not abuse his discretion in concluding that the Temple failed to satisfy the third criterion prescribed by the City Charter.

Having committed no error in concluding that the Temple had failed to meet the three criteria of the City Charter for unnecessary hardship, we hold that the Director did not abuse his discretion in refusing to grant the Temple's application.

B. *The Temple Was Not Deprived Of Its Procedural Rights Under HAPA Or The Hawai'i Or Federal Constitutions.*

1. *The Temple was not deprived of its procedural rights under HAPA.*

▮▮▮ The Temple argues that it was entitled to a full "contested case" hearing before the Director on its application for the variance. HAPA defines a "contested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91–1(5) (1993). Clearly, as the Temple argues, an application for a variance is a "contested case," in which considerations of due process require that the legal rights, duties, and privileges of specific parties be determined after a hearing, as opposed to an exercise of rulemaking, which affects the public at large. *See Foster Village Community Ass'n v. Hess*, 4 Haw.App. 463, 473–77, 667 P.2d 850, 856–58 (1983); *see also Mahuiki v. Planning Comm'n*, 65 Haw. 506, 654 P.2d 874 (1982) (holding that an application for a special management area use permit under the Coastal Zone Management Act is a contested case); *Town v. Land Use Comm'n*, 55 Haw. 538, 524 P.2d 84 (1974) (holding that the procedure for the adoption of district boundaries is a contested case); *East Diamond Head Ass'n v. Zoning Bd. of Appeals*, 52 Haw. 518, 479 P.2d 796 (1971) (holding that adjoining landowners are "aggrieved persons" with standing to intervene in a zoning variance application proceeding).

▮▮▮ In a contested case, HAPA requires that "all parties... be afforded an opportunity for [a] hearing after reasonable notice."

HRS § 91–9(a) (1993). At the hearing, the agency must admit "any and all evidence limited only by considerations of relevancy, materiality and repetition." *Cazimero v. Kohala Sugar Co.*, 54 Haw. 479, 483, 510 P.2d 89, 92 (1973) (construing HRS § 91–10(1)). Furthermore, "[e]very party shall have the right to conduct such cross-examination as may be required for a full and true disclosure of the facts, and shall have the right to submit rebuttal evidence." HRS § 91–10(3) (1993).

The public hearing that was conducted before the Director issued his decision regarding the Temple's variance application was not conducted in a trial-like manner. For example, no cross-examination of witnesses was allowed. However, HAPA does not require that the "contested case hearing" be the *sole* hearing on a contested case issue, nor that it be the *first* hearing. Indeed, HRS § 91–1(6) (1993) provides that " '[a]gency hearing' refers only to such hearing held by an agency *immediately prior to a judicial review* of a contested case as provided in section 91–14 [covering judicial review of contested cases]." (Emphasis added.) The legislative history of HRS § 91–1(6) establishes that this definition was intended to account for agency procedures that entailed more than one level of review:

> The intent of your Committee in inserting this definition is to clarify at what stage the formality required under Section 9 of this bill would apply within an agency *when more than one step is provided by law in which the adjudication of a matter in dispute will be handled by an agency.* This definition is to make clear that, in the area of "contested cases", a person would be required to exhaust his administrative remedies, and that the formality required under Section 9 would apply at the stage within the agency immediately prior to the stage when judicial review becomes available as provided in Section 14 of this bill.

Hse. Stand. Comm. Rep. No. 8, in 1961 House Journal, at 656 (emphasis added). *See also* Sen. Stand. Comm. Rep. No. 713, in 1961 Senate Journal, at 925 (adopting the analysis of Hse. Stand. Comm. Rep. No. 8).

The Temple acknowledges that HRS § 91–1(6) "complicate[s] matters," but argues that no direct appeal lies, under the express terms of the City Charter, from the Director's denial of a variance request to the ZBA. Therefore, the Temple maintains, the hearing that is intended to occur "immediately prior" to judicial review is the one conducted immediately before the Director makes his initial decision. In support of its argument, the Temple points to RCCCH § 6–909, which defines the purpose and duties of the ZBA. That section provides in relevant part that "[t]he zoning board of appeals shall hear and determine appeals from the actions of the director of land utilization *in the administration of the zoning code and subdivision ordinances and any rules and regulations adopted pursuant thereto.*" (Emphasis added.) Because RCCCH § 6–909 refers to "administration of the zoning *code* " (emphasis added), the Temple argues, variance applications are not covered, inasmuch as they are governed by the City Charter itself. The Temple discerns confirmation of its interpretation in RCCCH § 6–907, which provides in relevant part:

**Zoning Ordinances—**

The council shall, after public hearings, enact zoning ordinances which shall contain the necessary provisions to carry out the purpose of the general plan and development plans. *For purposes of this charter, the term "zoning ordinances" shall refer both to a codification of the standards listed below* and/or described in state law and to ordinances designating and redesignating particular parcels of property in terms of that codification. .

 *... The ordinances shall contain reasonable standards with respect to the location, bulk, size and permitted densities of buildings and other structures, the area of yards and other open spaces, off-street parking and loading spaces, and the use of buildings and lots.*

(Emphases added.) "Thus," the Temple concludes, "the Charter defines 'zoning code' [as] not including the variance provisions under the Charter itself." (Emphasis deleted.)

The City counters that applications for variances *are* governed by the zoning ordinance, highlighting LUO § 1.50 (1990), which provides in relevant part that "[p]etitions for varying the application of the provisions of the LUO shall be determined pursuant to Sections 6–909 and 6–910 of the City Charter[.]"

Although the Temple fails to mention it, the legislative history underlying the relevant City Charter provisions actually supports its argument. When the DLU was first promulgated in 1972, the power to hear variance appeals was vested solely in the ZBA. See RCCCH § 6–909(b) (1984 ed.).[21] A *separate* subsection of RCCCH § 6–609 authorized the ZBA to hear appeals of the Director's action "in the administration of the zoning and subdivision ordinances." *See* RCCCH § 6–909(a) (1984 ed.). In 1987, Honolulu Mayor Frank Fasi invoked his power to reorganize agencies pursuant to RCCCH § 4–202 (1984 ed.),[22] in order to

---

21. RCCCH § 6–909 (1984 ed.) provided:
 **Powers, Duties and Functions—**The zoning board of appeals shall:
 (a) Hear and determine appeals from the actions of the director of land utilization in the administration of the zoning and subdivision ordinances and any rules and regulations adopted pursuant thereto. An appeal shall be sustained only if the board finds that the director's action was based on an erroneous finding of a material fact, or that the director had acted in an arbitrary or capricious manner or had manifestly abused discretion.
 (b) Hear and determine petitions for varying the application of the zoning ordinance with respect to a specific parcel of land and may grant such a variance upon the ground of unnecessary hardship if the rec-

ord shows that (1) the applicant would be deprived of the reasonable use of such land or building if it were used only for the purpose allowed in that zone; (2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so.that the reasonableness of the neighborhood zoning is not drawn into question; and (3) the use sought to be authorized by the variance will not alter the essential character of the locality nor be contrary to the intent and purpose of the zoning ordinance. .
 The board shall specify the particular evidence which supports the granting of a variance.

22. RCCCH § 4–202 (1984 ed.) provides:

divest the ZBA of the power to hear variance appeals, placing that power in the Director instead. *See* Mayor's Directive 87–1 (May 13, 1987). The mayor's directive provided in relevant part that

> [a]uthority to hold public hearings and to make determinations on petitions to vary the application of the zoning ordinances of the City and County of Honolulu is transferred from the Zoning Board of Appeals to the Director of Land Utilization. This is a rearrangement of duties and functions of an agency prescribed by Section 6–903 [defining the powers of the Director] and Section 6–909(b), Revised Charter of the City and County of Honolulu 1973 (1984 Edition) ("RCH"). Authority to hear and determine appeals from actions of the Director of Land Utilization remains with the Zoning Board of Appeals as prescribed by Section 6–909(a), RCH.

*Id.* The Honolulu electorate "ratified" the mayor's directive by an amendment to the City Charter in 1992, removing language in RCCCH § 6–909 that had accorded the ZBA power to hear variance applications and adding language to RCCCH § 6–910, *see supra* section III.A.2.b, vesting that power in the Director instead. *See* Amendments to the Charter of the City and County of Honolulu, General Election November 3, 1992. The Final Report of the Charter Commission described the amendments as follows:

> *Digest:* Currently the authority to grant zoning variances has been transferred administratively from the Zoning Board of Appeals to the Director of Land Utilization under the authority granted to the Mayor to reorganize certain City functions. *This amendment would reflect and formalize the transfer of this authority.*
>
> *Rationale:* The administrative transfer of the authority to grant zoning variances has proved to be appropriate, based upon a review of the decisions to grant zoning

variances made by both the Zoning Board of Appeals and the Director of Land Utilization. *In making zoning variance decisions, the Zoning Board of Appeals was substantially influenced by the emotional appeals of landowners. In comparison, the Director of Land Utilization has been more objective in making decisions.*

Final Report of the Charter Commission 1991–1992 at 32 (emphases added).

Thus, as of November 1992, the ZBA's authority to hear and determine variance petitions derived from a provision of the City Charter—§ 6–909(b)—that was distinct from the provision—§ 6–909(a)—authorizing it to hear appeals from the Director's actions under the zoning code. Effective November 3, 1992, the ZBA's authority to grant variance petitions was deleted from the City Charter, according to the only available "legislative" history, because the ZBA was regarded as being overly prone to the influence of "emotional appeals." There is no particular reason to suspect that the ZBA would be less "emotional" on appeal than on direct consideration of variance petitions.

Moreover, the City's reliance on LUO § 1.50 is misplaced. The predecessor of that section, CZC § 21–1.5, provided that "[t]he Zoning Board of Appeals shall hear and determine petitions for varying the application of the provisions of this chapter pursuant to Section 6–909 of the Revised Charter of Honolulu 1973." Thus, the substitution of LUO § 1.50, which makes no mention of the ZBA, for CZC § 21–1.5, which did, merely conforms the City's "statutory" law to the City Charter, as amended. As such, LUO § 1.50, which does nothing more than acknowledge RCCCH §§ 6–909 and 6–910 in their present form, provides no basis for the argument that variance petitions are "in the administration of the zoning and subdivision ordinances."

---

**Executive Reorganization Power**—In the interest of administrative efficiency, effectiveness and economy, the mayor, and only the mayor, may propose to the council that the duties and functions of existing departments or agencies of the executive branch, excepting semi-autonomous agencies and departments or agencies reporting directly to the mayor, be changed or departments or agencies be combined, rearranged or renamed. Such proposal or proposals shall take effect upon approval of the council or sixty calendar days after transmittal to the council unless rejected by a two-thirds vote of the council's entire membership.

Not more than twenty departments shall exist at any one time.

Accordingly, the ZBA's current practice of hearing appeals from the Director's decisions regarding variance applications would appear to be unauthorized by the City Charter, as amended. Nevertheless, although it consistently maintained its position that it was entitled to appeal the Director's decision directly to the circuit court, the Temple *did* take an appeal to the ZBA in this case. And, at that hearing, it *was* accorded the full right of cross-examination. The fact that the DLU would seem to be violating *municipal* law with some regularity does not necessarily mean that *state* law—in this case, HAPA—has been contravened. In effect, the Temple received an *extra* hearing, one above and beyond the contemplation of the City Charter. The Temple's windfall in this regard violates neither the letter nor the spirit of HAPA. Indeed, if anything, the Temple stood to benefit from the additional process afforded by its "extra" appeal. Thus, to the extent that the DLU's *de facto* appeal mechanism—inconsistent with the City Charter as it may be—comports with the requirements of HAPA and due process, *see infra,* any structural defect in the process could not have harmed the Temple.

In this regard, the Temple argues that "[a] 'contested case' hearing implies a hearing *de novo.*" It further argues that, because it was not permitted to introduce evidence not al-

ready considered by the Director and was limited in the scope of its cross-examination by the ZBA's standard of review,[23] it was therefore denied the full substantive protections guaranteed by HAPA. The Temple cites no authority, however, in support of its position that a contested case hearing must be a hearing *de novo,* and, indeed, there is no such support in the language of HAPA.

When it has intended to require *de novo* review within the context of internal agency appeals, the legislature has demonstrated elsewhere in the HRS that it is capable of expressly saying so. *See, e.g.,* HRS §§ 103D–709 (1993) (governing appeals of agency procurement decisions to the Department of Commerce), 386–87 (1993) (governing appeals of the director of the Department of Labor and Industrial Relations in workers' compensation proceedings), and 398–24 (Supp.1997) (governing appeals from the decisions of the Department of Labor and Industrial Relations enforcing family leave requirements). The absence of such clear language in HAPA implies that the legislature did not intend to mandate a uniform review mechanism for all internal agency appeals. Thus, the hearing before the ZBA was properly denominated as the "agency hearing," as contemplated by the definition of "contested case" set forth in HRS § 91–1(5).[24]

---

**23.** "An appeal shall be sustained only if the board finds that the director's action was based on an erroneous finding of a material fact, or that the director had acted in an arbitrary or capricious manner or had manifestly abused discretion." RCCCH § 6–909 (1996 Supp. to 1994 ed.).

**24.** The Temple asserts that the hearing before the ZBA cannot be considered a "contested case hearing" because the ZBA has the power only to "sustain" an appeal pursuant to RCCCH § 6–909, rather than "reverse" the Director's decision. In particular, the Temple claims that "the City consistently has taken the position that the ZBA cannot 'reverse' the Director's decision on a variance, but can only 'sustain' the appeal and send the matter back to the Director for his further review." As a result, the Temple asserts, the Director may choose to ignore the ZBA's ruling. Therefore, "the ZBA can never determine the rights, duties or privileges of an applicant for a variance...." (Emphasis deleted.)

Although the Temple promises that, "if the City will not concede that this is the position and

practice of the ZBA, [the Temple's] counsel will attempt to provide transcripts of other proceedings in which the ZBA has publicly so described this alleged limitation on its powers," it does not appear to have attempted to adduce any such evidence. Thus, there is nothing in the record to support the Temple's claim. Nevertheless, if the position and practice of the ZBA is as the Temple suggests, it would appear to be contrary to the spirit and letter of RCCCH § 6–909. RCCCH § 6–909 expressly provides that the ZBA "shall *hear and determine* appeals from the actions of the director of land utilization...." (Emphasis added.) There is nothing in that language indicating a limitation on the ZBA's ability to reverse a decision of the Director. Moreover, this court has previously impliedly acknowledged the ZBA's power to determine the outcome of the appeals that it hears. In *Price v. Zoning Board of Appeals,* 77 Hawai'i 168, 176, 883 P.2d 629, 637 (1994), after holding in the ZBA's favor in a case involving the violation of a zoning provision forbidding the operation of an eating establishment in an area zoned as "country," this court re-

In this case, the Temple was permitted freely to introduce evidence (including rebuttal evidence) at the public hearing before the HO (which was incorporated into the record considered by the ZBA), and in the course of the hearing before the ZBA, the Temple was further permitted to introduce evidence relevant to the ZBA's inquiry (*i.e.*, whether the Director had abused his discretion) and was accorded the right fully to cross-examine witnesses. In fact, at the public hearing on its 1993 variance application, the Temple introduced an enormous quantity of evidence—including the testimony of over fifty witnesses and literally reams of exhibits documenting the plans and height of the Hall, the support for the Temple in the community, and the religious, artistic, and architectural importance of the Hall. In this connection, the transcripts of witnesses' testimony, both on direct and cross-examination, in the proceedings before the ZBA exceed 1,500 pages in length. The Temple certainly had its say in these proceedings.

The only significant constraint on the Temple's ability to present its case within the DLU, given the two-tiered review structure described above, related to its capacity to cross-examine the witnesses who had testi-

fied before the HO but not the ZBA. The Temple seemingly could have subpoenaed the same witnesses to appear before the ZBA, pursuant to the subpoena powers accorded by HRS § 92–16(a)(1).[25] However, it is possible that the appellate character of the review that the ZBA conducted of the Director's decision may have limited the Temple's ability to fully examine these witnesses.[26]

On the other hand, the opposition witnesses in question were irate neighbors and a representatives of two community organizations, "Concerned Citizens of Palolo" and "Life of the Land." The neighbors' testimony consisted in relevant part of their subjective feelings regarding the size of the Hall. The representatives of the community organizations advanced legal arguments in opposition to the variance application. It seems unlikely to us that cross-examination would have unearthed anything of particular value regarding such arguments and subjective feelings. Thus, on the record before us, we hold that the DLU's two-tiered mechanism of review did not infringe unduly upon the Temple's right in a contested case "to conduct such cross-examination as may be required

manded to the *ZBA*, and not to the Director, "for a determination of an appropriate fine."

Most significantly, however, the ZBA's alleged practice is simply not relevant to the present appeal. In this case, the ZBA did not "sustain" the appeal; rather, it affirmed the Director's decision. Thus, any prejudice that might have resulted from such a practice could not have occurred here. The ZBA determined the Temple's rights, duties, or privileges in a hearing provided by the agency immediately prior to judicial review.

**25.** HRS § 92–16 (1993) provides in relevant part:

**Power of boards to issue subpoenas, administer oaths, appoint masters, etc.** (a) *Any board* (which term as used in this section means any board or commission of the State or of any political subdivision of the State) *which is by law authorized or required to hold hearings for the purpose of receiving evidence*, shall have the following powers, in addition to those provided for by any other law, in connection with the hearings:

(1) To subpoena witnesses upon subpoena signed by the chairperson, acting chairperson, or any member, or executive secretary, or executive officer of or under the board who is so authorized by the board. The

subpoenas shall be served in the same manner, and the witnesses subpoenaed shall be entitled to the same witness fees, as in the case of a witness subpoenaed to testify before a circuit court. Any circuit court, upon the written application of any member of the board or of any master appointed by it as in this section provided, shall have power to enforce obedience to the subpoena by contempt proceedings.

(Emphases added.) Of course, as discussed *supra* in section III.B.1, the City Charter does not *authorize* the ZBA to hear appeals from decisions of the Director. However, because HAPA *requires* that an agency provide an "agency hearing" in contested cases for the purpose of receiving evidence, and because the *de facto* practice of the DLU is to conduct the HAPA-style "contested case" hearing before the ZBA rather than the HO, the provisions of HRS § 92–16 apply to the appeal hearing conducted by the ZBA because it is "by law [*i.e.*, HAPA] ... required to hold hearings for the purpose of receiving evidence."

**26.** Because no witnesses were subpoenaed to appear before the ZBA in this case, we need not and do not address what limits, if any, RCCCH § 6–909 may have imposed on the permissible scope of examination.

for a full and true disclosure of the facts ... [and] to submit rebuttal evidence." HRS § 91–10(3) (1993).

The Temple argues additionally that its procedural rights were violated by "the prohibition of examination of the Director with respect to documents and at least one expert, presented to the Director privately by his staff, before he made his decision, in rebuttal to the [Temple's] evidence of the religious significance of the building in question." In his testimony before the ZBA, the Director acknowledged that his staff (1) had made a book concerning Buddhism available to him, which had not been made a part of the record, and (2) had consulted an unidentified "qualified individual" regarding the Buddhist belief system. Such "invisible" fact-finding is violative of HRS §§ 91–13 (1993) ("No official of an agency who renders a decision in a contested case shall consult any person on any issue of fact except upon notice and opportunity for all parties to participate[.]") and 91–9(e)(2) (1993) ("For the purpose of agency decisions, the record shall include ... [e]vidence received or considered[.]"). *See Mauna Kea Power Co. v. Board of Land and Natural Resources*, 76 Hawai'i 259, 262, 874 P.2d 1084, 1088 (1994) ("Where an agency consults outside sources, the right of a party to cross-examine these sources and present rebuttal evidence is violated.") (Citation omitted.).

HRS § 91–14(g) provides in relevant part that the circuit court, in reviewing an agency action, "may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order *if the substantial rights of the petitioners may have been prejudiced ....*" (Emphasis added.) This court's appellate review, in turn, of the circuit court's decision rendered

upon its review of an agency's decision constitutes a secondary appeal. In a secondary appeal, the standard of review is one in which this court

must determine whether the [circuit] court was right or wrong in its decision, applying the standards set forth in HRS

§ 91–14(g) to the agency's decision. [This court's] review is further qualified by the principle that the [agency's] decision carries a presumption of validity and [a]ppellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Hardin v. Akiba*, 84 Hawai'i 305, 309–10, 933 P.2d 1339, 1343–44 (1997) (quoting *University of Hawai'i Professional Assembly v. Tomasu*, 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995) (citation omitted) (brackets in original).

*Kahana Sunset Owners Ass'n v. County of Maui*, 86 Hawai'i 66, 68, 947 P.2d 378, 380 (1997). In conducting such review, this court must often employ a type of harmless error analysis to violations of HAPA. Thus, if the Director's consultation of evidence outside the record did not affect the Temple's substantial rights, his decision must be affirmed despite the technical HAPA violation. *Cf. Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir.1993) ("Although allegations of a post hoc addition to the Administrative Record sufficiently alleges procedural error, an allegation of a post hoc addition does not in itself sufficiently allege prejudice.").

Applying the foregoing statutory principle to the present case, we note that the Director testified at the ZBA hearing that although he *did*, in fact, consult outside sources regarding the nature of Buddhism, he did *not* give them any weight in rendering his decision "because the religious aspects of [the Hall were] not at issue in the variance.". As discussed *supra* in section III.A.2.b, the Director was correct in his assessment that "religious hardship" is not germane to the test set forth in the City Charter for determining the presence of sufficient "unnecessary hardship" to justify a variance. Thus, even had the Temple been afforded the opportunity to rebut whatever impressions the Director may have formed regarding Buddhist beliefs or practice from sources outside the record, the outcome of the proceedings would not have been altered.[27] In other words, notwith-

27. For this reason, the present case is distinguishable from *Town v. Land Use Commission*, 55 Haw. 538, 524 P.2d 84 (1974), and *Waikiki Shore, Inc. v. Zoning Bd. of Appeals*, 2 Haw.App.

standing that it would have been improper for the Director to rely on the Temple's evidence of religious hardship in rendering his decision, he did not do so. That being the case, we can discern no prejudice to the Temple's substantial rights resulting from the Director's exposure to the outside sources, and we hold that the error was harmless.

Accordingly, we hold that the Temple's procedural rights under HAPA were not violated in the proceedings before the HO and the ZBA.

## 2. *The Temple was not denied its right to procedural due process under the United States or Hawai'i Constitutions.*

■ The Temple asserts substantially the same bases as described above for its argument that it was denied its right to procedural due process under the fourteenth amendment[28] to the United States Constitution and article I, section 5[29] of the Hawai'i Constitution (1978).[30] In particular, the Temple argues (obliquely) that, because it was not al-

---

43, 625 P.2d 1044 (1981). In *Town*, the Land Use Commission had received a petition to amend the district designation of certain property on the island of Maui from agricultural to rural. 55 Haw. at 539, 524 P.2d at 85. The Commission held several hearings in Honolulu and on the island of Molokai, and, after a postponement, conducted a final hearing in Hilo. The appellant, who was present at the initial hearings, was unable to attend the final hearing, and objected by letter to the introduction, in his absence, of any further evidence or testimony from the petitioner. *Id.* at 539–40, 524 P.2d at 86. Nevertheless, the Commission allowed the petitioner to argue in favor of his petition and to adduce documentary evidence, including an "unofficial survey of the three largest distributors of vegetables and fruits on the island of Maui, indicating that there was little or no demand for Kula grown fruits." *Id.* at 540, 524 P.2d at 86. The vicechairman of the commission moved to approve the petition, noting that he had conducted his own "field investigation" and that he "was satisfied that this land is unsuitable for agricultural pursuits." *Id.* The vice-chairman emphasized that his motion was "not based on anything that was said here today because these facts were made known to us before." *Id.* This court reversed the Commission's decision on appeal, on the basis, *inter alia*, that the vicechairman's "investigation," conducted without notice to the parties, was improper and that the receipt of *ex parte* testimony and evidence from the petitioner was prejudicial. *Id.* at 549, 524 P.2d at 91–92.

Similarly, in *Waikiki Shore*, an applicant for a variance in a proceeding before the ZBA sent a post-hearing letter to members of the ZBA "rebutting information brought out by the opponents of the variance at the hearing." 2 Haw. App. at 44, 625 P.2d at 1045. At a subsequent meeting, one of the members stated that "the letter clarifies a lot of questions that we had in our mind." *Id.* He also stated that he had inspected the premises in question. *Id.* The ZBA then granted the variance. *Id.* Relying on *Town*, the ICA reversed the ZBA's decision. *Id.* at 45, 625 P.2d at 1046.

In both *Town* and *Waikiki Shore*, the prejudice flowed from (1) *ex parte* arguments of the appellant's adversary, which the appellant had not had

an opportunity to rebut, (2) *ex parte* "field investigations," (3) introduction of evidence that was *relevant* to the outcome-dispositive issue, and (4) no opportunity for rebuttal. By contrast, in the case at bar, the "off-the-record" material that was called to the Director's attention was wholly irrelevant to the proceedings.

28. The fourteenth amendment to the United States Constitution provides in relevant part that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

29. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]"

30. The intervenors Concerned Citizens argue in their answering brief that the Temple waived the issue of procedural due process because it "failed to properly petition the [c]ircuit [c]ourt for the right to adduce or produce evidence pursuant to [HRS § ] 91–14(e)." HRS § 91–14(e) (1993) provides:

If, before the date set for hearing, application is made to the court for leave to present additional evidence material to the issue in the case, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon such conditions as the court deems proper. The agency may modify its findings, decision, and order by reason of the additional evidence and shall file with the reviewing court, to become a part of the record, the additional evidence, together with any modifications or new findings or decision.

Concerned Citizens concludes that "[i]f the Temple had complied with the above procedural statute, then [Concerned Citizens] and this Court could ascertain specifically what evidentiary matters the Temple felt wronged by, and its claimed procedural errors would have been

lowed to cross-examine witnesses during the public hearing before the HO, and the evidence that it was permitted to adduce before the ZBA was limited to that considered by the Director, it was denied the right to procedural due process.

As noted above, the only significant limitation to which the Temple was subjected in the ZBA proceedings was that it was afforded no opportunity to cross-examine those witnesses who had testified at the public hearing but not before the ZBA. The question before this court, therefore, is whether that restriction of access to cross-examination violated the Temple's right to procedural due process.

 We have repeatedly recognized that

> [d]ue process is not a fixed concept requiring a specific procedural course in every situation. *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu,* 70 Haw. 361, 378, 773 P.2d 250, 261 (1989); *cf. Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230] ... (1961). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Sandy Beach Defense Fund,* 70 Haw. at 378, 773 P.2d at 261; *Morrissey v. Brewer,* 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] ... (1972). The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Sandy Beach Defense Fund,* 70 Haw. at 378, 773 P.2d at 261; *see also Mathews v. Eldridge,* 424 U.S. 319, 333 [96 S.Ct. 893, 902, 47 L.Ed.2d 18] ... (1976); *North Georgia Finishing, Inc. v. Di–Chem, Inc.,* 419 U.S. 601, 605–06, [95 S.Ct. 719, 721–22, 42 L.Ed.2d 751] ... (1975).

*Evans v. Takao,* 74 Haw. 267, 282, 842 P.2d 255, 262 (1992). *See also Kernan v. Tanaka,* 75 Haw. 1, 22, 856 P.2d 1207, 1218 (1993).

*Price v. Zoning Bd. of Appeals,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994) (brackets and ellipsis points in original).

The full rights of due process present in a court of law, including presentation of witnesses and cross-examination, do not automatically attach to a quasi-judicial hearing. *See Goss v. Lopez,* 419 U.S. 565, 95 S. Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)....

> Determination of the specific procedures required to satisfy due process requires a balancing of several factors: (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail. *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33; *Silver v. Castle Memorial Hosp.,* 53 Haw. 475,] 484, 497 P.2d [564,] 571 [ (1972) ].

*Sandy Beach Defense Fund,* 70 Haw. at 378, 773 P.2d at 261.

This court has never, however, directly considered the issue of cross-examination within the context of zoning proceedings. On the other hand, several decisions have addressed analogous circumstances. In *Sandy Beach Defense Fund,* for example, we held that trial-like procedures were not obligatory in proceedings conducted before the Honolulu City Council in a challenge of the City and County's issuance of a Special Management Area use permit pursuant to the Coastal Zone Management Act. 70 Haw. at 379, 773 P.2d at 262. Sixteen public meetings had been called by the Council, during which all

---

cured." This argument fails for two reasons. First, the Temple is claiming that it was denied the right of cross-examination at the hearing before the HO. "After the fact," rebuttal-type evidence may not compensate for the deprivation of the right of cross-examination in the first instance (although we hold on the facts of this case that the Temple was not prejudiced by the denial of cross-examination). Second, the Temple has consistently asserted its right to cross-examine witnesses before the HO throughout the many procedural stages of this matter. Therefore, the Temple has not waived the issue on appeal.

interested persons were granted the opportunity to present their positions. *Id.* at 379, 773 P.2d at 261. Noting that several of the appellants had participated in the public hearings and that "[a]t no time during the proceedings were they denied the opportunity to address the Council or to ask questions of other witnesses," we held that the imperatives of procedural due process had been satisfied. *Id.* Similarly, in *Medeiros v. Hawaii County Planning Commission,* 8 Haw. App. 183, 194–98, 797 P.2d 59, 67–68 (1990), the ICA held that public hearings concerning a geothermal resource permit application had adequately satisfied the requirements of due process notwithstanding that the contestants of the permit application were not accorded the opportunity for cross-examination. *But cf. Mortensen v. Board of Trustees of the Employees' Retirement Sys.,* 52 Haw. 212, 219–221, 473 P.2d 866, 871–72 (1970) (holding that the right to cross-examination must be accorded in disability claims proceedings).

Other jurisdictions are split as to whether zoning variance hearings and similar proceedings may validly be conducted without according the parties the right to cross-examine all adverse witnesses. *Compare, e.g., Chongris v. Board of Appeals,* 811 F.2d 36, 42 (1st Cir.) ("[O]mitting crossexamination at a zoning hearing or kindred event does not amount to a denial of due process in violation of the fourteenth amendment."), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987), *and Third & Catalina v. City of Phoenix,* 182 Ariz. 203, 895 P.2d 115, 121 (App.1994) (holding that the omission of cross-examination in proceedings before the Phoenix Fire Safety Advisory Board did not violate due process), *with Kelly Supply Company, Inc. v. City of Anchorage,* 516 P.2d 1206, 1209 (Alaska 1973) ("[T]he right of cross-examination undoubtedly exists in hearings on zoning matters[.]" (Citations and internal quotation signals omitted.)), *and Humble Oil & Refining Co. v. Board of Aldermen,* 284 N.C. 458, 202 S.E.2d 129, 137 (1974) ("[A] zoning board of adjustment, or a board of aldermen conducting a quasi-judicial hearing, can dispense with no essential element of a fair trial ... [including the right to] cross-examine witnesses[.]" (Citations omitted.)). *See generally* 3 Edward H. Zie-

gler, Jr., *Rathkopf's Law of Zoning and Planning* § 37.06(5) (Supp.1997) (listing cases on both sides of the issue).

An independent examination of the *Sandy Beach Defense Fund/Mathews* factors suggests that the DLU's variance application procedures are cause for concern, at least in the abstract. With regard to the first factor, it is clear that the Temple has an important property interest at stake in its variance application. With regard to the second, the absence of the opportunity for cross-examination in the ZBA's proceedings creates the potential "risk of an erroneous deprivation" in the form of the loss of potentially vital evidence. As noted above, even if the Temple had subpoenaed witnesses to testify at to the ZBA's hearings, the limitations imposed on the ZBA's scope of review could conceivably hamper the Temple's ability to examine them fully. At least one of the RCCCH § 6–610 factors—the inquiry into whether the applicant's land possesses "unique characteristics"—would seem to invite testimony that is technical in nature. Fully testing the strength of the opinions of architects or similar adversarial witnesses through cross-examination (or though leading questions of a hostile witness on direct examination) would likewise seem to be worthwhile. Finally, with regard to the third factor, although the City argues that it would be unthinkably burdensome on the DLU to offer full trial-like hearings before the Director were to render his decision as to each variance request, all variance applications were presumably afforded such protections in the ZBA prior to 1987, when the mayor shifted power over the determination of variance requests from the ZBA to the Director. Thus, the City was evidently capable of coping with these procedures in the past without undue administrative burden.

Nevertheless, despite the *potential* for unfairness that is subsumed within the DLU's processes, it appears that the Temple suffered no demonstrable prejudice in this case. As noted above, the Temple adduced extensive oral and documentary evidence and was permitted to rebut the testimony of opposing witnesses. No expert witnesses testified in opposition to the Temple at the public hear-

ing before the HO, with the exception of a DLU employee, who also testified in the course of the ZBA hearings, where the Temple subjected her to intensive cross-examination. Only neighbors and community leaders, whose testimony generally related to their subjective feelings and legal arguments about the Hall's size, were exempted from cross-examination in this case.

■ A constitutional error is harmless so long as "the court . . . [is] able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1966) (internal quotation signals omitted); *see also State v. Fukusaku*, 85 Hawai'i 462, 482, 946 P.2d 32, 52 (1997); *State v. Arceo*, 84 Hawai'i 1, 35, 928 P.2d 843, 877 (1996); *State v. Loa*, 83 Hawai'i 335, 353, 926 P.2d 1258, 1276 (1996). Although some constitutional rights are considered so fundamental that their denial may never be considered harmless, *see State v. Suka*, 79 Hawai'i 293, 298, 901 P.2d 1272, 1277 (App.), *cert. denied*, 79 Hawai'i 341, 902 P.2d 976 (1995), the harmless error standard nevertheless applies to infringements on the right to cross-examine witnesses. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (addressing a criminal defendant's right to confrontation).

On the record before us, we hold that the Temple's inability to cross-examine its neighbors regarding whether they actually "felt" oppressed by the Hall's size was harmless beyond a reasonable doubt. Wholly separate and apart from their testimony, there was substantial support in the record for the Director's and ZBA's decisions. It is virtually inconceivable that cross-examination of the witnesses in question would have altered the decisions in any way. *Cf. Glenbrook Road Ass'n v. Board of Adjustment*, 605 A.2d 22, 38–40 (D.C.Ct.App.1992) (holding that the failure to allow cross-examination in a zoning dispute was a violation of procedural due process, but that it was harmless because the parties had failed to show prejudice).

Similarly, we hold that the Director's exposure to material outside the record—relating to the nature of Buddhism—was constitutionally harmless beyond a reasonable doubt be-

cause the question of "religious hardship" was immaterial to the issue before the Director, and, moreover, the Director expressly declined to consider the material in rendering his decision. *See supra* at section III. B.1.

Accordingly, although the DLU's review procedures governing variance applications are flawed and have the potential for violating the rights of litigants to procedural due process, we hold beyond a reasonable doubt that any procedural errors committed in this case did not prejudice the Temple and were, therefore, harmless.

C. *There Is No Right Of Direct Appeal From The Director's Decision To The Circuit Court.*

■ The Temple has maintained that it was entitled to a direct appeal to the circuit court from the Director's decision denying its variance application. Although, as we have noted, there is merit to the Temple's argument that the City Charter and the LUO do not authorize appeals to the ZBA from decisions of the Director regarding variance applications, the fact that the DLU's *de facto* practice has been to make such an appeal available does not offend—and is not inconsistent with—HAPA. HAPA requires that litigants be afforded the opportunity for an appeal to the circuit court after an "agency hearing," which, in this case, was conducted by the ZBA and not the Director. That being the case, we hold that a direct appeal to the circuit court would have been premature.

D. *The Denial Of The Temple's Variance Application Did Not Violate Its Rights To The Free Exercise Of Religion Accorded By RFRA, The First Amendment To The United States Constitution, Or Article I, Section 4 Of The Hawai'i Constitution.*

Relying on RFRA, the first amendment to the United States Constitution, and article I, section 4 of the Hawai'i Constitution, the Temple argues that its right to the free exercise of religion was denied by the Di-

rector's denial of its application for a zoning variance in this case.

### 1. *RFRA is no longer operative.*

The Temple's reliance on RFRA may be quickly dispatched. RFRA was enacted by Congress in 1993, in response to *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the United States Supreme Court held, *inter alia*, that the first amendment to the United States Constitution does not prohibit neutral laws of general application from burdening the free exercise of religion. Through RFRA, Congress sought legislatively to overrule *Smith* by creating a statutory right "restor[ing] the compelling interest test" as to all laws substantially burdening religion. *See* 42 U.S.C. § 2000bb(b). Last year (after the briefing of the present appeal had been completed), the United States Supreme Court held that RFRA exceeded the enumerated powers of Congress and was, therefore, unconstitutional. *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Accordingly, RFRA is no longer of any assistance to the Temple.

### 2. *The Temple has not demonstrated a "substantial burden" on its free exercise of religion.*

■■■ The United States Court of Appeals for the Eleventh Circuit identified two thresholds that a government regulation, which is challenged on first amendment "free exercise" grounds, must overcome:

> The first test distinguishes government regulation of religious beliefs and opinions from restrictions affecting religious conduct. The government may never regulate religious beliefs; but, the Constitution does not prohibit absolutely government regulation of religious conduct.... The second threshold principle requires that a law have both a secular purpose and a secular effect to pass constitutional muster.

*Grosz v. City of Miami Beach,* 721 F.2d 729, 733 (11th Cir.1983), *cert. denied,* 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). The *Grosz* court held that a zoning ordinance, which banned the building of a church or use of a building for a church in a particular district, passed both of the enunciated tests. The *Grosz* threshold tests are also satisfied in the present appeal, because (1) the City's height restrictions regulate the Temple's *conduct* and not its *beliefs*, and (2) the regulations have a clear secular purpose and effect.

■■■ Thus, this court must take the final step in its analysis—balancing the burden to the Temple's free exercise of religion against the government's interest in restricting the height of the Hall.[31] However, before

---

**31.** Normally, pursuant to *Smith,* an ordinance of general applicability, such as the one at bar, would not be subject to first amendment attack. *See Smith,* 494 U.S. at 882–90, 110 S.Ct. at 1601–06. However, as the Temple points out, the United States Supreme Court left a loophole in *Smith* that should apply to the Temple's case:

> As the plurality pointed out in [*Bowen v.] Roy,* our decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of "religious hardship" without compelling reason. *Bowen v. Roy,* [476 U.S. 693,] 708 [106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986)].

*Id.* at 884, 110 S.Ct. at 1603. In *Bowen,* the plaintiffs had refused to disclose the social security number of their daughter to their state welfare agency, as mandated by the federal statute governing the issuance of food stamps, arguing that the governmental use of their daughter's social security number violated their Native American religious beliefs. 476 U.S. at 695, 106 S.Ct. at 2149. The state responded by cutting the plaintiffs' food stamp allotments. *Id.* The United States Supreme Court affirmed the state's action, reasoning that the first amendment did not compel the government to adopt an internal organization that accommodated the religious beliefs of all of its citizens and that the food stamp law was generally applicable and neutral. *Id.* at 707–09, 106 S.Ct. at 2156–57. The *Bowen* court distinguished *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (holding that the state could not constitutionally deny unemployment benefits to the plaintiff because she had refused to work on the day of her Sabbath), and *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (holding that the state could not constitutionally deny unemployment benefits to a Jehovah's Witness who left his employment at a steel mill because it began work on armaments in contravention of his religious convictions) as follows:

> The statutory conditions at issue in those cases provided that a person was not eligible for

any balancing can occur, the Temple must show that there has been a substantial burden on its free exercise of religion:

> In order to find an unconstitutional infringement on Appellant's religious practices [in violation of the first amendment to the United States Constitution and article I, section 4 of the Hawai'i Constitution], it [is] necessary to examine whether or not the activity interfered with by the state was motivated by and rooted in a legitimate and sincerely held religious belief, whether or not the parties' free exercise of religion had been burdened by the regulation, the extent or impact of the regulation on the parties' religious practices, and whether or not the state had a compelling interest in the regulation which justified such a burden.

*State ex rel. Minami v. Andrews*, 65 Haw. 289, 291, 651 P.2d 473, 474 (1982). *Accord Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)....

. . . .

As a preliminary matter, "it is necessary in a free exercise case for one to show the coercive effect of the [law] as it operates against him in the practice of his religion." *School District of Abington Township v. Schempp*, 374 U.S. 203, 223 [83 S.Ct. 1560, 1572, 10 L.Ed.2d 844] (1963). *Accord Thomas v. Review Board, Indiana Employment Security Division*, 450 U.S. 707, 717–18 [101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624] (1981); *Koolau Baptist Church v. Department of Labor*, 68 Haw. 410, 418], 718 P.2d [267,] 272 (1986)....

... Appellants must show a "substantial burden" on religious interests. *Koolau*, 68 Haw. at [418], 718 P.2d at 272; *Wisconsin v. Yoder*, 406 U.S. at 218 [92 S.Ct. at 1534]....

*Dedman v. Board of Land & Natural Resources*, 69 Haw. 255, 260–61, 740 P.2d 28, 32 (1987), *cert. denied*, 485 U.S. 1020, 108 S.Ct. 1573, 99 L.Ed.2d 888 (1988) (some brackets in original and some added).

The Temple argues that there is no evidence in the record refuting its claim that the application of the LUO's height restrictions in its case violates the Temple's exercise of Chogye Order Buddhism. However, the burden of demonstrating that the restriction is unconstitutional is on the Temple:

> [W]here it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging

unemployment compensation benefits if, "without good cause," he had quit work or refused available work. The "good cause" standard created a mechanism for individualized exemptions. If a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent. Thus, as was urged in *Thomas*, to consider a religiously motivated resignation to be "without good cause" tends to exhibit hostility, not neutrality, towards religion. In those cases, therefore, it was appropriate to require the State to demonstrate a compelling reason for denying the requested exemption.

*Id.* at 708, 101 S.Ct. at 1427 (citations omitted). The *Smith/Bowen* "individualized exemption" rule was also invoked in *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), in which the Court struck down the enforcement of an ordinance forbidding "unnecessar[]y" killing of animals because the enforcement clearly showed an intent to discriminate against the religious practice of a Santeria church. The Court held that, because the ordinance had been enforced only against animal sacrifice and exempted as "necessary" any number of other practices, including hunting, slaughter for food, eradication of pets, and euthanasia, the *Bowen* rule applied. *Id.* at 537, 113 S.Ct. at 2229.

In the case at bar, the City's variance law clearly creates a "system of individualized exemptions" from the general zoning law. *Cf. Keeler v. Mayor and City Council of Cumberland*, 940 F.Supp. 879, 885–86 (D.Md.1996) (holding that Cumberland's historic preservation ordinance provided for a "system of individualized exemptions" where the Historic Preservation Commission might choose not to allow a building to be demolished if the building was "of unusual importance to the City, State or nation"); *American Friends Serv. Comm. v. Thornburgh*, 961 F.2d 1405, 1408–09 (9th Cir.1991) (holding that the Immigration Reform and Control Act's exemptions from employer sanctions did not come within the *Smith* "individualized exemption" exception because it excluded "entire, objectively-defined categories of employees from the scope of the statute").

Because *Smith*'s prohibitory rule denying any application of free exercise analysis to laws of general application does not apply in this case, we need not and do not reach the question whether there is such a rule under the Hawai'i Constitution.

the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest, and unmistakable.

*State v. Gaylord,* 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995) (quoting *State v. Lee,* 75 Haw. 80, 90–91, 856 P.2d 1246, 1253 (1993)). *See also [Hawai'i Housing Authority v.] Lyman,* 68 Haw. 55,] 71, 704 P.2d [888,] 898 [ (1985) ] (citation omitted). *Housing Fin. and Dev. Corp. v. Castle,* 79 Hawai'i 64, 75, 898 P.2d 576, 587 (1995).

The Temple has failed to make out a prima facie case that its exercise of religion has been burdened. Granted, the record includes testimony that the "balance and harmony" of the buildings forming the Temple compound are ingredients essential to the generation of the meditative state that is fundamental to Chogye Buddhist practice. The record further contains the expressed sentiments of a number of the Temple's members that lowering the Hall's roof would be tantamount to an act of religious desecration. Nevertheless, the record also establishes that the Temple's troubles were self-inflicted.

In the first place, the Temple need not have chosen to purchase land and build within the R–5–zoned residential district located in Pālolo Valley. The Temple could lawfully have constructed the Hall to a height of seventy-five feet (with appropriate setbacks and subject to some caveats) in districts zoned, *inter alia,* for apartments, *see* CZC §§ 21–6.2(a)(3), 21–6.13 and 21–6.24, and business, *see* CZC §§ 21–8.11(a)(7) and 21–8.13. It is simply insufficient that Abbot Ki felt that the property chosen would be convenient for parking, beautiful, *cf. Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 825 (10th Cir.1988) (" '[T]he First Amendment does not require the City to make all land or even the cheapest or most beautiful land available to churches.' "), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989) (quoting *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood,* 699 F.2d 303, 307 (6th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983)), or even "holy." The Temple cannot force the City to zone accord-

ing to its religious conclusion that a particular plot of land is "holy ground." *Cf. Dedman,* 69 Haw. at 259–63, 740 P.2d at 31–34 (rejecting a challenge to the designation of an area in the Kilauea Middle East Rift Zone, on the Island of Hawai'i, as a geothermal resource subzone by "Pele practitioners" who believed that the land in that area was sacred and that geothermal plants would desecrate the body of Pele).

Moreover, the Temple initially proposed construction plans for the Hall that prescribed a height limit of sixty-six feet, but then deliberately chose not to abide by its own plans, as approved. Interestingly, as part of its case before the HO, the Temple adduced the testimony of an architect as to the great expense and trouble that would be caused by lowering the Hall roof—thus implying that the Temple could have tolerated this act, were it not so expensive and inconvenient. Both of these facts cast significant doubt on the Temple's assertion that the Hall "must" be seventy-five feet tall in order to be usable for religious purposes. In any event, the considerable expense (both financial and spiritual) of removing the Hall's completed roof could easily have been avoided by amending the plans on file with the DLU in advance and seeking official approval of the greater height—which would have been granted or not, as the case may be, *before* construction commenced.

When all is said and done, and at most, the record establishes that the burdens placed on the Temple by the height restrictions are of expense and inconvenience. These are generally insufficient to constitute a substantial burden on the free exercise of religion. *See Lakewood,* 699 F.2d at 307; *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (holding that laws requiring Sunday closing did not burden the exercise of Orthodox Jewish shopowners who had to undergo the expense of closing two days per week in order to accommodate their own Sabbath in addition to the legally-mandated closing day).

The Temple relies upon *Islamic Center of Mississippi v. City of Starkville,* 840 F.2d 293 (5th Cir.1988), to support its contention that its free exercise rights have been bur-

dened and that the government's interest in zoning cannot overcome those rights. That case, however, is readily distinguishable. In *Islamic Center*, the plaintiffs—a group of university students—attempted to establish a mosque near their university. *Id.* at 294. The local zoning ordinance prohibited the use of buildings as churches in all areas, within city limits, that were proximate to the campus, unless the city board of aldermen granted an exception. *Id.* Although the students repeatedly requested exceptions for a number of alternative sites, they were denied any exception by the aldermen, who cited traffic, noise, and other concerns. *Id.* at 295–96. The record reflected that the aldermen had never denied an exception to any other religious group and that a number of Christian churches had been located near the campus. *Id.* at 297. The *Islamic Center* court noted that, "[a]s the Supreme Court observed in *Schad [v. Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ], the availability of other sites outside city limits does not permit a city to forbid the exercise of a constitutionally protected right within its limits," *id.* at 300, and held that, "[b]y making a mosque relatively inaccessible within the city limits to Muslims who lack automobile transportation, the City burden[ed] their exercise of their religion." *Id.* at 299.

In the present case, no absolute ban on the use of the Temple's property for religious purposes has been imposed, but only a regulation regarding the height to which its buildings may be constructed. There are other areas in the City in which the Temple could build its Hall to a height of seventy-five feet. Moreover, unlike *Islamic Center*, there is no indication in the present matter that the City has acted in a discriminatory manner toward the Temple based upon the religious tradition practiced in it.

Finally, other jurisdictions have denied claims similar to the Temple's in the face of even more restrictive zoning regulations. For example, a number of courts have upheld zoning laws that expressly banned the building or establishment of churches within certain areas. *See Lakewood*, 699 F.2d at 307; *Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221 (9th Cir.), *cert. denied*, 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990); *Messiah Baptist Church*, 859 F.2d at 826; *Grosz, supra*; *International Church of the Foursquare Gospel v. City of Chicago Heights*, 955 F.Supp. 878 (N.D.Ill.1996); *United States v. Village of Airmont*, 839 F.Supp. 1054 (S.D.N.Y.1993); *City of Colorado Springs v. Blanche*, 761 P.2d 212 (Colo.1988).

Accordingly, inasmuch as the Temple has failed to demonstrate a substantial burden on its free exercise of religion, this court need not evaluate whether the City's interest in enforcing its height regulations is compelling. For the reasons discussed above, we hold that the Temple's free exercise rights, as protected by the first amendment to the United States Constitution and article I, section 4 of the Hawai'i Constitution, have not been violated.

### IV. CONCLUSION

For the foregoing reasons, we affirm the orders of the circuit court.