92 P.3d 1046

**Dr. George R. HARKER,**
**Appellant–Appellant,**

v.

**Judith SHAMOTO, Department of Labor and Industrial Relations; Patricia Hamamoto, Superintendent of Education, Department of Education and Robyn Honda, Personal** [1] **Specialist for the Department of Education, Appellees–Appellees.**

**No. 25615.**

Intermediate Court of Appeals of Hawai'i.

May 14, 2004.

Reconsideration Denied June 2, 2004.

Certiorari Denied June 14, 2004.

Dr. George R. Harker, on the briefs, Appellant Pro Se.

Frances E.H. Lum and Robyn M. Kuwabe, Deputy Attorneys General, on the briefs, for

---

1. The word "Personal", as used in the caption of    this case, should be "Personnel".

Appellee Director of Labor and Industrial Relations.

James E. Halvorson and Steve K. Miyasaka, Deputy Attorneys General, on the briefs, for Appellees Patricia Hamamoto, Department of Education, and Robyn Honda.

BURNS, C.J., LIM and NAKAMURA, JJ.

Opinion of the Court by BURNS, C.J.

In this secondary appeal, Appellant George R. Harker (Harker) appeals from the Circuit Court of the Second Circuit's January 6, 2003 Final Judgment finalizing its January 6, 2003 Order Affirming Employment Security Appeals Office's Decision 0101433 Dated July 10, 2002 (January 6, 2003 Order). We affirm.

## BACKGROUND

Harker had been a substitute teacher with the Department of Education (DOE) beginning in 1998.

In the spring of 2001, Harker applied to renew his eligibility to be a substitute teacher for the 2001–02 school year. On April 2, 2001, Harker signed a DOE "Substitute Teacher General Request Form" that stated, in relevant part, as follows: "Upon issuance of the DOE employment document, Form SF 5A1, I will be eligible to . . . 2) Be called for assignments, as needed, for the school year, except for customary recesses, intersessions and vacations. . . ."

On May 25, 2001, the DOE sent Harker a Notification of Personnel Action, DOE Form SF 5A1, notifying him that he was "payroll certificated and eligible to be called for day-to-day, temporary duties as needed" effective July 1, 2001 to June 30, 2002, and that "SCHOOL START DATES VARY. THE LAST DAY FOR MOST SCHOOLS IS JUNE 7, 2002."

Harker applied for unemployment insurance benefits. In a June 19, 2001 Summary of Fact Finding Interview, Claims Examiner K. Aoki (Aoki) wrote that "Claimant does have a reasonable assurance of employment with the DOE after the summer break. Claimant is not entitled to benefit payments based on DOE wages beginning [Sunday] 6/10/01 to [Saturday] 7/28/01." Aoki also wrote, "( [Claimant] substitute[s] for Lahaina Intermediate–Year Round Schedule. Returns from summer session 7/26/01)."

On September 18, 2001, Harker filed an appeal to the State of Hawai'i Department of Labor and Industrial Relations (DLIR). A hearing by Appeals Officer Judith Shamoto (Shamoto) was held on November 21, 2001. On July 10, 2002, Shamoto mailed her decision. It stated, in relevant part, as follows:

*STATEMENT OF FACTS:*

Claimant . . . reapplied to work as a substitute teacher during the school year 2001–2002. His application was approved and employer issued a notification of personnel action for the school year 2001–2002. Without this form, claimant could not have performed services for pay for employer. The position was funded for the year and there were no changes in the method of work assigned. Employer anticipated no changes in the student population and the number of substitute teachers needed for the school year. There was more demand for services as a special education teacher due to the Felix decree.

Employer's records showed that claimant was on the preferred list of three schools in his district. He accepted and worked 90 assignments at 8 different schools beginning on July 9, 2000. All schools ended on June 7, 2001. The records also showed that school terms for next payroll year beginning July 1, 2001, for year round, multi-track and traditional schools, began on July 25, 2001 and ended on June 7, 2002. Schools on traditional schedule began on August 21, 2001 and ended on June 7, 2002.[2]

There were four schools in the district that also schedule summer classes in the recess periods between two regular school years. Claimant contended that he was never offered the opportunity to work during the summer session. Employer maintained that there is no demand for substitutes since there are substantially less students

---

**2.** The record does not clearly explain the difference between "year round, multi-track and traditional schools" and "[s]chools on traditional schedule".

and teachers during these summer sessions that run between June and July.

Substitute teachers are casual employees who are hired with the understanding that they will work only as replacements for regular teachers who are absent or unable to teach their classes for other reasons. There are no guaranteed hours or benefits. The opportunity to work can fluctuate from 0 to 5 days per week. Claimant was aware of this policy when he applied for the job.

Claimant contended that the Department's application of the statute was discriminatory and not intended to apply to substitute teachers. He also felt that the same substitutes were called but he was not given the same opportunity to work. Employer did not agree since claimant worked at eight different schools although he was on the preferred list of only three. In addition, the records showed that claimant was offered work on rotation and by pre-arrangement (personal calls from teachers) which is a process available to all teachers.

*REASONS FOR DECISION:* 383–29(b) [3] Section 383–29(b) of the Hawaii Employment Security Law provides as follows:

(1) Benefits based on service in an instructional, research, or principal administrative capacity in an institution of education shall not be paid to an individual for any week of unemployment which begins during the period between two successive academic years, or during a similar period between two regular terms, whether or not successive ... if the individual performed such services in the first of such academic years or terms and if there is a contract or a reasonable assurance that such individual will perform services in any such capacity for any institution of education in the second of such academic years or terms.

Section 12–5–39, Administrative Rules. Denial of benefits to employees of educational institutions and government agencies during specific periods. (a) As used in 383–29(b), Hawaii Revised Statutes, and this section:

. . . .

(11) The "contract" which an individual has with an institution of education or government agency may be written, oral, implied, or expressed. In some cases, the contract may be merely a notice of appointment or reappointment or a letter indicating that the individual's services have been accepted. Generally, as long as there is a mutual commitment between an individual and a particular institution, the individual's services shall be considered covered by a contract;

(12) "Reasonable assurance" means a written, oral, or implied agreement that the individual will perform services in an institution of education or government agency in an instructional, research, principal administrative, or any other capacity during the ensuing academic year or term. Notification from the institution of education or government agency to the individual of reemployment for the next academic year or term shall constitute reasonable assurance, provided there are sufficient facts to show that the individual can realistically expect to be employed during the ensuing academic year or term, including, but not limited to:

(A) The existence of a job opening at the time of notification;

(B) The absence of any contingencies, such as:

(i) Future enrollment;

(ii) Availability of funding;

(iii) Vacancies due to absence of regular employees; or

(iv) Any other conditional factors;

. . . .

(c) Benefits shall not be paid during:

(1) The interval between two successive academic years, such as the summer vacation period; . . .

3. Hawaii Revised Statutes § 383–29(b) (2003).

(6) Any period between academic terms or during an established and customary vacation recess for a holiday within an academic term when an employee in an educational institution working in one capacity receives reasonable assurance of continued employment in another capacity in the second of two academic terms or after the vacation or holiday period within the academic term. For example, if an individual performed services in a professional capacity in the first of two academic years or terms for an educational institution and will be returning to an educational institution in a nonprofessional capacity in the next academic year or term, the "between terms" denial would apply.

Claimant provided services in an instructional capacity for an institution of education during the academic school year ending June 7, 2001. He applied for and was given a contract for the next academic year for the same institution of education the earliest of which started on July 25, 2001. Although there were summer sessions at four of the schools at which he worked, the summer session periods for all four schools does not fall within the academic year. Employer continued to require the services of substitutes who are contacted on a rotation basis and by pre-arrangement as the work became available. Although the claimant contended that the employer's method of selection of teachers was a discriminatory process, there were only two methods by which teachers were offered work, by random selection or by pre-arrangement, both systems by which claimant obtained work. There was insufficient evidence to show that employer was engaged in any illegal practice as the courts have heard and upheld appeals from decisions rendered by the Department.

Since there were no changes in enrollment and the position was funded for the entire year, there were no contingency factors. The Appeals Officer finds that there was sufficient evidence to show that in accordance with Section 12–5–39(a)(12), claimant worked for the institution of education during his base period and can reasonably expect to be offered employment in the next school year. The wages paid to him by the institution of education may not, therefore, be used in the computation of his benefit amount for the period shown.

*DECISION:*

The Department's decision is affirmed. Claimant's wages from the institution of education are not usable for payment of benefits between the two academic years beginning June 10, 2001 and ending July 28, 2001.

(Footnotes added.)

Harker appealed to the Circuit Court of the Second Circuit. Oral argument was held before Judge Shackley F. Raffeto on December 18, 2002. In its January 6, 2003 Order, the court stated, in relevant part, as follows:

In particular, the Court determines, using the clearly erroneous standard, that the appeals officer's findings of fact in her July 10, 2002 decision are not clearly erroneous and there is no basis to overturn or modify the findings or to remand the case for further findings.

With regard to the appeals officer's conclusions of law in her July 10, 2002 decision, the Court determines, using the right wrong standard, that there is no basis to overturn or modify the conclusions of law or to remand the case.

With regard to mixed questions of fact and law, the Court determines pursuant to *Camara v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984), giving due deference to the agency's expertise in the area, that there is no basis to overturn or modify the decision or to remand the case.

Additionally, the decision of the appeals officer is entitled to deference by the Court because it is well-supported by the evidentiary record. *Medeiros v. Hawaii County Planning Commission,* 8 Haw. App. 183, 797 P.2d 59 (1990).

IT IS THEREFORE HEREBY ORDERED that the Employment Security Appeals Office Decision 0101433 dated July 10, 2002, is affirmed. There is insufficient reason to reverse or otherwise modify the decision, or to remand the case for

further proceedings. There are no further issues or claims outstanding.

On January 31, 2003 Harker filed a notice of appeal from the January 6, 2003 Order. On August 6, 2003, his appeal was assigned to this court.

## STANDARDS OF REVIEW

■ An appellate court's review of a circuit court's review of an administrative agency's decision is a secondary appeal. *Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998). In determining whether the circuit court's decision was right or wrong, the appellate court must apply the standards set forth in Hawaii Revised Statutes (HRS) § 91–14(g) (1993) to the agency's decision. *Id.* HRS § 91–14(g) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

■ Pursuant to the above statutory provision, an agency's "conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Korean Buddhist,* 87 Hawai'i at 229, 953 P.2d at 1327 (quoting *Bragg v. State Farm Mut. Auto. Ins.,* 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996)). Furthermore, an "agency's decision carries a presumption of validity, and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences." *Korean Buddhist,* at 229, 953 P.2d at 1327.

The interpretation of a statute is a question of law that we review *de novo.* Similarly, a trial court's conclusions of law are reviewable *de novo* under the right/wrong standard. Under the *de novo* standard, this court must examine the facts and answer the pertinent question of law without being required to give any weight or deference to the trial court's answer to the question. In other words, we are free to review a trial court's conclusion of law for its correctness.

*State v. Kelekolio,* 94 Hawai'i 354, 356, 14 P.3d 364, 366 (Haw.App.2000) (citations omitted).

The Hawai'i Supreme Court has repeatedly stated that, when interpreting a statute, an appellate court's "foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, [a court's] only duty is to give effect to the [the statute's] plain and obvious meaning." *State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (internal quotation marks, citations, and brackets in original omitted). Accordingly,

> we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue

is the use of legislative history as an interpretive tool.

... This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (quoting *State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999)) (internal quotation marks, citations, ellipses, and brackets and block quote format omitted).

### HARKER'S ARGUMENT

In his opening brief, Harker states, in relevant part, as follows:

> The issue is whether substitute teachers should be able to collect unemployment benefits during the summer months. After paying such benefits for over twenty years the Department of Labor and Industrial Relations in collaboration with the Department of Education initiated a policy to deny those benefits in or about 1997. The result was the evisceration and emasculation of the safety net that made it possible to survive economically as a substitute teacher in Hawaii.
>
> ....
>
> ... [I]t would not be possible for the DOE to make any statement regarding "reasonable assurance" with regard to substitute teachers particularly as it applies to the interim sessions at various schools during the months of June and July.
>
> ....
>
> For over twenty years the DOE and the DLIR paid substitute teachers for Christmas break, Spring break, summer vacation period and all other interim breaks. However in 1997 the DOE took the position that substitute teachers should not be paid during the summer months since there was reasonable assurance that they would be employed the following fall....
>
> ....

> ... The DOE would do some really creative interpretation of the situation to avoid making payments of unemployment for the summer to substitute teachers. The DOE would claim that the school year ran only from August to June and that it did not exist during the summer.... Never mind about summer it just did not exist. Since 1997 this has been the interpretation. Never mind that nothing in the Law had changed and that unemployment had been paid the previous 20 years.
>
> ....
>
> While years ago the usual academic year was from September and ending in June, however, today the trend is for year round schools with all sorts of interesting schedules. The academic year can not be generalized....
>
> The DOE may suggest that its academic year runs from August to June but on examination it can be shown that some schools operate all year with a week off here and a week or two off there. It is these weeks that would constitute "between and within denial" of unemployment situations. Some schools are out in the summer and have a definite summer vacation. That vacation period would clearly constitute an unemployment denial situation under the terms of the Unemployment regulations. But as we will shown [sic] the substitute teacher is not tied to any one particular school and would vie for jobs at one of the other schools in session. The availability of work is not predicated on one school but must be based on the total operation of the DOE.
>
> For a teacher assigned to a particular school there is no ambiguity. The school is in session or it is out of session. If it is out of session the regular teacher is not eligible to collect unemployment insurance. The teacher is already being paid for this time though contractual relations with the DOE. The situation for the substitute teacher is quite different. Although a particular school may be on an interim break another school or schools will be in session. The substitute teacher goes where s/he is needed and works or not as needed.

The crux of this issue is what is happening in summer? If there was no activity than the matter would be clear. Reasonable likelihood of employment in the fall and no unemployment benefits summer. However, the situation is that schools are operating in the summer and some substitute teachers are working while others are being denied an opportunity to work. To add insult to injury the ones that are not able to work are denied the opportunity to collect unemployment that would carry them through the lean days of summer.

. . . .

Regardless of statements to the contrary by the DOE, there is no reasonable assurance of work for a variety of reasons.

1) the automated method of contacting substitute teachers is totally unreliable and the results unpredictable. The DOE notes that the system is incompatible with cell phones, answering systems and just about every other aspect of contemporary technology associated with the modern phone. . . .

If the substitute teacher is not sitting in reasonable proximity to the phone and takes the call, the system will hang up and call someone else. If the substitute has a life, the likelihood of catching the phone is very small. The professional educator and substitute teacher who wants to have some reasonable control over their teaching assignments cultivates prospective jobs by establishing a network of teachers to establish future work.

2. The facts show, at least in my own case, that being on the calling list doesn't necessarily mean one will work the first few weeks of school. . . .

. . . .

It must be noted that under the current interpretation of things by the DOE and the DLIR substitute teachers are eligible to collect unemployment once school starts in the fall if they do not work a minimum of two days in each week. . . .

In his reply brief, Harker states, in relevant part, as follows:

The point is . . . there may be a summer break between two academic years when nothing is going on in the summer and the concept of not paying unemployment benefits under this interpretation of law might be valid. But there is another equally valid scenario where in fact there is a break between a term in one academic year and a summer term and then a break and then another term in a second academic year. This is the situation in the [DOE] operation. Many schools are shut down for the summer. However, a select few are not and offer a summer term.[4] During that summer term substitute teachers are employed.

The question of whether unemployment would be paid is really only applicable to the week between the end of school in June and the beginning of the summer term. . . .

. . . .

. . . The DOE is trying to suggest that during the summer substitute teachers are on vacation just like regular teachers when in fact their unemployment is because of reduced job opportunities and not any contractual provision defining vacation time.

. . . .

For twenty-six schools on Maui there is an open space between **academic years.** For the four schools that are open in the summer there is the **"term"** conveniently overlooked by the DLIR in its argument.

. . . .

. . . The teachers have a contract that defines when they will work and not work and more importantly when they are on paid vacation, i.e. during the summer term at all schools. If they choose to work during the summer it is extra money. The substitutes do not have such a contract. They are on call and may be called or not as needed. . . .

. . . .

The thing that must be kept in mind is that the substitute teacher does not have a contract or any other sort of understanding as to when s/he is on vacation. A substitute teacher has not designated or

---

4. The dates of the 2001 "summer term" were not stated.

defined vacation and really has no assurance of work at any time for that matter.

. . . .

[Appellee–Appellee Robyn] Honda acknowledges [in the answering brief at] page 12 that indeed summer school is in session and that teachers and substitute teachers are being employed. Whether it is considered part of the academic year is irrelevant and makes no difference what so ever. The fact is that school is in session and some teachers and substitutes are being employed while other not. . . .

. . . .

Rule 12–5–39(a)12 utilizes the language as follows "provided there are sufficient facts to show that the individual can realistically expect to be reemployed during the ensuing academic year or term, . . ." Note that the rule provides that a "term" can exist between academic years. Indeed that is the case at four schools on Maui as per Honda testimony.

. . . .

Testimony shows that the DLIR and the DOE are purposely miss applying the notion that Hawaii Statutes do not allow the payment of unemployment benefits or indeed that the unemployment program is suspended for substitute teachers during any period between two Academic years.

This intentional misinterpretation of the rules began in 1997 after twenty years of offering unemployment benefits to substitute teachers from 1977 to 1997. The DLIR and DOE cite the rule change of 1987 involving the concept of "reasonable assurance" as the basis.

It is clear from the record that the DLIR and DOE have no intention of following the regulations promulgated by the State legislature in accord with Federal policy regarding unemployment compensation.

(Footnote added; emphasis in original; all sics omitted.)

## ISSUE AND ANSWER

According to Harker, all school terms for the 2000–01 school year ended on Thursday, June 7, 2001. For the 2001–02 school year, the school terms for year-round schools began on Wednesday, July 25, 2001, and the school terms for schools on traditional schedule began on Tuesday, August 21, 2001. It appears that somewhere between June 7, 2001 and August 21, 2001, four of thirty schools on Maui had a summer school term. The precise question presented by this appeal is whether, for the summer break after June 7, 2001 and before July 25, 2001, Harker is entitled to benefit payments based on DOE wages. The answer is no.

## DISCUSSION

As amended by Act 187 (1971), HRS § 383–29(b) stated, in relevant part, as follows:

Benefits based on service in an instructional . . . capacity in an institution of education shall not be paid to an individual for any week of unemployment which begins during the period between two successive academic years, or during a similar period between two regular terms, whether or not successive, . . ., if the individual has a contract or contracts to perform services in any such capacity for any institution or institutions of education for both such academic years or both such terms.

Relevant legislative history states that this "provision is intended to insulate the institutions against benefit claims during vacation, semester-break, or sabbatical leave periods when individuals are paid by but do not perform services for the institutions." Stand. Comm. Rpt. No. 429, Sen. J. at 978 (1971).

As amended by Act 148 (1977), HRS § 383–29(b)(1) (Supp.2003) states, in relevant part, as follows:

Benefits based on service in an instructional . . . capacity in an institution of education shall not be paid to an individual for any week of unemployment which begins during the period between two successive academic years, or during a similar period between two regular terms, whether or not successive, . . ., if the individual performed such services in the first of such academic years or terms and if there is a contract or a reasonable assurance that such individual.

will perform services in any such capacity for any institution of education in the second of such academic years or terms.

Relevant legislative history states, in relevant part, as follows:

(6) *Denying benefits to certain professional school employees between terms of their school employment.* This amendment specifies that benefits are to be denied to professional school employees between school terms if there is reasonable assurance of their reemployment.

1977 Stand. Comm. Rpt. No. 726, Haw. H.J. at 1623 (1977).

On December 24, 1986, the United States Department of Labor issued "Unemployment Insurance Program Letter No. 04-87" that states, in relevant part, as follows:

1. **Purpose.** To provide guidance to State agencies on the interpretation of "reasonable assurance" as it relates to application of the denial provisions of Section 3304(a)(6)(A), Federal Unemployment Tax Act (FUTA).

2. **References.** Section 3304(a)(6)(A), FUTA: *Draft Language and Commentary to Implement the Unemployment Compensation Amendments of 1976–P.L. 94–566* and its five supplements; . . . .

3. **Background.** . . . [A]n employee of an educational institution . . . will be ineligible to receive unemployment compensation . . . between academic years or terms and during vacation periods and holiday recesses within terms if the employee has a "reasonable assurance" of performing services in such educational employment in the following year, term or remainder of a term . . . .

"Reasonable assurance" is defined as a written, oral, or implied agreement that the employee will perform services in the same or similar capacity during the ensuing academic year, term, or remainder of a term . . . .

Reviews of court cases and selected States' procedures have revealed inconsistencies in the application of the between and within terms provisions, particularly where the circumstances of employment change from one academic period to the next. This interpretation is being issued to clarify the effect of the between and within terms denial on certain classes of claimants and to ensure that States consistently apply these Federal law requirements . . . .

. . . .

4. **Interpretation.** The unemployment compensation program is intended in part to relieve the impact of involuntary unemployment on the claimant. The between and within terms denial provisions in Section 3304(a)(6)(A) . . . were created to prevent an employee with a reasonable assurance of resuming employment in the next ensuing academic period from receiving benefits during certain holiday and vacation periods or between academic years or terms. The provisions of Section 3304(a)(6)(A) have, therefore, been interpreted (1) to require denial of benefits to claimants between and within academic years who have a reasonable assurance of resuming employment in the next ensuing academic period, . . . .

5. **Examples.** The following examples have been developed to assist States in understanding how our interpretation may be applied to some of the more complex situations which may arise . . . .

. . . .

e. *On-call Substitute Teacher Retained on On-call List.* . . . An on-call substitute teacher in the first academic year is kept on the on-call list for the next year. The circumstances under which the teacher will be called for work are not changed. The State determines that a substantial change in economic terms and conditions is not anticipated. Therefore, the between and within terms denial provisions would apply because the claimant has a reasonable assurance of performing services.

6. **Action Required.** States are requested to review their laws and pro-

cedures and make any changes needed to conform with this interpretation.

Harker contends that, as used in HRS § 383–29(b)(1), the phrase "academic years" refers to situations where there are no summer terms, whereas the phrase "regular terms" refers to situations where there are winter terms, spring terms, and summer terms. Although the record does not reveal when summer school began and ended in 2001, we will assume that it began after June 7, 2001 and before July 25, 2002. Harker further contends that substitute teachers have a reasonable assurance that they will not have an opportunity to perform services as substitute teachers during the summer terms. Thus, their work during the spring and their lack of work during the summer term exclude them from HRS § 383–29(b)'s ban on benefits "for any week of unemployment which begins ... during a ... period between two regular terms, whether or not successive, ..., if the individual has a contract or contracts to perform services in any such capacity for any institution or institutions of education for both ... such terms."

We disagree with Harker's conclusion that Hawaii Administrative Rule (HAR) 12–5–39(a)12 "provides that a 'term' can exist between academic years." Rule 12–5–39(a)12 speaks of "the ensuing academic year or term". The words "or term" were added as an alternative to "the ensuing academic year" to include those schools whose regular school academic term is not the typical regular school academic year.

In light of (1) the statement in Harker's April 2, 2001 "Substitute Teacher General Request Form" that "[u]pon issuance of the DOE employment document, Form SF 5A1, I will be eligible to ... [b]e called for assignments, as needed, for the school year, except for customary recesses, intersessions and vacations ..."; (2) the DOE's May 25, 2001 Notification of Personnel Action, DOE Form SF 5A1, notifying Harker that he was "payroll certificated and eligible to be called for day-to-day, temporary duties as needed" effective July 1, 2001 to June 30, 2002; (3) the use of the phrases "academic years" and "regular terms" in HRS § 383–29(b)(1); (4) the legislative history and purpose of HRS § 383–29(b)(1) (Supp.2003); (5) HAR Rule 12–5–39; and (6) the December 24, 1986 "Unemployment Insurance Program Letter No. 04–87" issued by the United States Department of Labor, we conclude that HRS § 383–29(b)(1) was written so that when, based on DOE wages, a regular teacher or a substitute teacher applies for unemployment benefit payments for the period after the end of one school year and the beginning of the succeeding school year, the merits of the application will be decided without any consideration of the facts that (a) some schools have a summer school term, and (b) some regular teachers (and possibly some substitute teachers) are summer school teachers. The Hawaii Employment Security Law contemplates that a regular teacher who teaches during the regular school year or term will be on vacation during the summer break. The fact that some regular teachers are employed as teachers during the summer or that some regular teachers are involuntarily unemployed as teachers during the summer does not change that contemplation.

Thus, a regular teacher who teaches during the regular school academic year or term is not eligible for unemployment benefits during the summer break even when one or more summer school teaching positions was or were available and unsuccessfully sought. For purposes of the Hawaii Employment Security Law, summer school teaching positions are unrelated to, totally separate from, and unconnected with teaching positions during the regular school academic year or term.

The Hawaii Employment Security Law does not apply a different rule in the case of a substitute teacher. Thus, a substitute teacher who teaches during the regular school year is not eligible for unemployment benefits during the summer break even when one or more summer school substitute teaching positions was or were available and unsuccessfully sought. For purposes of the Hawaii Employment Security Law, summer school substitute teaching positions are unrelated to, totally separate from, and unconnected with substitute teaching positions during the regular school academic year or term.

## CONCLUSION

Accordingly, we affirm the circuit court's decision denying Harker unemployment benefits during the period from June 10, 2001 through July 28, 2001.